SHERMAN S. ROGERS, Respondent, *v.* THE COMMON COUNCIL OF THE CITY OF BUFFALO et al., Appellants.

Legislation which creates a board of commissioners consisting of two or more persons, and which provides that not more than a certain proportion shall be taken from one party, does not amount to an arbitrary exclusion from office, or to a general regulation requiring qualifications not mentioned in the State Constitution.

The provision, therefore, of the Civil Service Act (§ 1, chap. 354, Laws of 1883, as amended by chap. 410, Laws of 1884), which provides for the appointment by the governor, and the confirmation by the senate, of three persons as civil service commissioners, "not more than two of whom shall be adherents of the same party," is not violative of the provision of the State Constitution declaring that "no member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers (§ 1, art. 1); nor is it violative of the provision declaring that no person shall be "deprived of life, liberty or property without due process of law." (§ 6, art. 1.)

*Barker* v. *People* (3 Cow. 686); *Atty.-Gen.* v. *City of Detroit* (58 Mich. 213), distinguished.

The provision of said act, requiring the regulations prescribed by the mayor of a city for admission into the civil service to be approved by the state civil service commissioners before they go into effect (§ 8), is not violative of the constitutional provision requiring that all appointive officers of a municipality shall be "appointed by such authorities thereof as the legislature shall designate for that purpose" (§ 2, art. 10) as the submission of the regulations to the state board does not interfere with the general powers of the local authorities to appoint.

Said act is not violative of the constitutional provision declaring "that no other oath, declaration or test shall be required as qualification for any office of public trust," save as specified therein. (§ 1, art. 12.) A statute which requires an applicant for appointment to a position in a public office to show his fitness therefor, is not an illegal test within the meaning of that provision.

*It seems* the object of the constitutional provision was to prohibit the requirement of oaths, declarations or tests of a religious character, such as had been required by English statutes.

(Argued June 19, 1890; decided October 7, 1890.)

APPEAL from judgment of the General Term of the Supreme Court in the fifth judicial department, entered upon an order

made January 11, 1889, which affirmed a judgment in favor of plaintiff entered upon a decision of the court on trial at Special Term.

This action was brought by plaintiff, as a tax-payer of the city of Buffalo, to restrain the defendants, the common council and mayor, etc., of said city, from authorizing, drawing or paying any warrant for the salary of the defendant Ceriac Diebold, as street and health inspector of the city of Buffalo, on the ground that his appointment was in violation of the civil service law and of the rules prescribed thereunder by the mayor of said city.

*William F. Sheehan* for appellant. The so-called Civil Service Acts are unconstitutional and void. (Const. art. 1, § 1; *Atty.-Gen.* v. *City of Detroit*, 24 N. W. Rep. 887, 889; 58 Mich. 213; *People* v. *Hurlbert*, 24 id. 94; *Barker* v. *People*, 3 Cow. 706.) The civil service law so far as it applies to the city of Buffalo, is unconstitutional and void. (*People ex rel.* v. *Albertson*, 55 N. Y. 50; *People ex rel.* v. *McKinney*, 52 id. 378; *People ex rel.* v. *Porter*, 90 id. 76; *Schuster* v. *Bd. of Health*, 49 Barb. 450; *People ex rel.* v. *Angle*, 109 N. Y. 564.) The legislature cannot establish arbitrary exclusions from office, or any general regulations requiring qualifications. The right of suffrage is guaranteed to the citizens of the state by the Constitution, and the right to hold public office must be included in the right to vote. (*Taylor* v. *Porter*, 4 Hill, 146; *In re Jacobs*, 98 N. Y. 106; *Barker* v. *People*, 3 Cow. 706.) The charter of the city of Buffalo (§ 50, title 2) provides that the street commissioner " shall, by and with the advice and consent of the common council, appoint an assistant and as many inspectors of health and streets as the common council shall authorize." The common council have authorized the appointment of thirteen such inspectors. It cannot be seriously questioned, that the common council having the power of confirmation of these officers, necessarily possesses the right of rejection. This power of confirmation and rejection takes these officers out of the classified list.

(*People ex rel.* v. *Common Council*, 78 N. Y. 39.) No test can be required for holding office, except such as is provided by the Constitution itself. (State Const. art. 12; *People ex. rel.* v. *Angle*, 109 N. Y. 572; *Barker* v. *People*, 3 Cow. 706.) When the legislature exempted from the operation of the Civil Service Act persons employed as laborers or workmen it intended all those who were to perform labor by the day. These inspectors may supervise and direct the work of those under them, but they may be none the less laborers though graded a step higher than the others or called by a different name. (Laws of 1883, chap. 354, § 7.)

*Ansley Wilcox* for respondent. Laborers are not absolutely excluded from the operation of the Civil Service Act. The provision of section 7 of the original Civil Service Act, in reference to them, has no application at all to the civil service rules established for the cities of the state, but applies only to laborers in the employ of the state itself. (*People ex rel.* v. *Civil Service Bds.*, 41 Hun, 287; 103 N. Y. 657.) Health and street inspectors, under the Buffalo charter, are not laborers or workmen in the sense in which those words are used in section 7 of the Civil Service Act. They are not "persons merely employed as laborers or workmen." (Rep. N. Y. Civil Service Com. 1889, p. 71.) The appellant claimed that these inspectors are "subordinates of an officer elected by the people, for whose errors or violation of duty he is financially responsible," and, therefore, that they are exempt from the operation of the Civil Service Acts. This is erroneous. (*Walsh* v. *Trustees*, 96 N. Y. 427, 439; *Walsh* v. *Mayor, etc.*, 107 id. 220; 41 Hun, 299; *Maximilian* v. *Mayor, etc.*, 62 N. Y. 160; *Ehrgott* v. *Mayor, etc.*, 96 id. 264, 273; *Turner* v. *City of Newburgh*, 109 id. 301; *City of Buffalo* v. *Holloway*, 7 id. 492; *Brisso* v. *City of Buffalo*, 90 id. 679; Story on Agency, § 319; Smith on Mast. & Serv. 376–378.) Appellants' contention that the civil service rules could not properly apply to the health and street inspector, for the reason that the municipal civil service law provides, "nor shall any regulation

contravene an existing statute, relating to entrance to said service," is untenable. (*People* v. *Lacombe*, 99 N. Y. 43, 49, 50; *People* v. *McKinney*, 52 id. 374, 383.)  Appellants' contention that the entire civil service legislation of the state is unconstitutional and void, as being repugnant to article 1, section 1 of the Constitution, because the Civil Service Act of 1883 (Chap. 354) in section 1, declares that the governor shall appoint three persons as civil service commissioners, "not more than two of whom shall be adherents of the same party," is untenable. (*People ex rel.* v. *Green*, 58 N. Y. 295; *People* v. *Bull*, 46 id. 57, 68, 69; *People* v. *Briggs*, 50 id. 553; *In re Mayor, etc.*, 99 id. 569, 583.)  There is no provision of the Constitution which prohibits the legislature from prescribing by general laws reasonable and proper qualifications for office holders, where such qualifications are not prescribed in the Constitution itself, and the method of appointment or election is left to the legislature.  *A fortiori*, the legislature is not prohibited from declaring that the persons selected to fill offices which are to be filled by appointment shall, in fact, be qualified and fit for their official duties, or from directing that their fitness shall be ascertained either by the officer authorized to make the appointment or by some other investigating body.  This is all that the Civil Service Acts have undertaken to do.  (Const. art. 3, § 1; *People ex rel.* v. *Fisher*, 24 Wend. 215; *In re G. E. R. Co.*, 70 N. Y. 367, 368; *People ex rel.* v. *Dayton*, 55 id. 367; *People* v. *Briggs*, 50 id. 553; *People* v. *Bd. Suprs.*, 17 id. 235; *Martin* v. *Hunter*, 1 Wheat. 326, 327; *M. Bank* v. *Van Dyck*, 27 N. Y. 400; *In re Jackson*, 14 Blatchf. 245; *McCullough* v. *Maryland*, 4 Wheat. 316, 421, 423; *Greaton* v. *Griffin*, 4 Abb. Pr. [N. S.] 310, 315; *People* v. *Draper*, 15 N. Y. 532, 538; *People* v. *Batchelor*, 22 id. 128; *People* v. *Woodruff*, 32 id. 355, 364; *F. Dept.* v. *A. Co.*, 106 id. 566, 577, 578; *Astor* v. *Mayor, etc.*, 62 id. 567, 573–575; *People* v. *McDonald*, 69 id. 362; *In re Mayor, etc.*, 99 id. 569, 583; *People* v. *Snedeker*, 14 id. 52; *Ex parte McCollum*, 1 Cow. 550; *People* v. *Bull*, 46 N. Y. 57; *People* v. *Lacombe*, 99

id. 43 ; *People* v. *Hurlburt,* 24 Mich. 44 ; *State* v. *Kennon,* 7 Ohio, 546 ; *Connor* v. *Mayor, etc.,* 5 N. Y. 285, 295 ; *U. S.* v. *Curtis,* 106 U. S. 371 ; *U. S.* v. *Perkins,* 116 id. 483 ; *People ex rel.* v. *Clute,* 50 N. Y. 451 ; *People* v. *Comstock,* 78 id. 356 ; *In re Sullivan,* 55 Hun, 285 ; Story on Const. Law, §§ 1843, 1849 ; *Brown* v. *U. S.,* 113 U. S. 568, 571 ; *People* v. *Dayton,* 55 N. Y. 367; *Stewart* v. *Laird,* 1 Cranch, 299, 309 ; *People* v. *Angle,* 109 N. Y. 564, 568, 575.)

Peckham, J. Long prior to the passage of the first so-called Civil Service Reform Act by the federal congress, the condition of that service and the method of appointment thereto had become the subject of most anxious thought on the part of many upright, intelligent and experienced men. The semi-barbarous maxim that " to the victors belong the spoils," had been the foundation-stone upon which the system of appointments to the civil service of the nation had been placed for a number of years. The system had grown to such proportions under the necessary enlargement of the service, and it had become in practice so entirely the creature of political chiefs, that the appointing power was regarded merely as a formal means of registering and legalizing the appointments to office which had already been substantially made by them. Such a system took from the officer, who was to make the appointment, all sense of personal or official responsibility to the people of the country, and substituted in its stead the feeling that he was responsible only to his party to make such appointments to office as the leading men therein should choose to ask for.

It is not to be wondered at that, as the numbers of officers increased, and the numbers of applicants therefor increased in even greater proportion, a general scramble for office became the accompaniment of every change of administration, and to such an extent was it carried that the officers of the government had really not the time to spare for the discharge of the other duties pertaining to their office, because of the constant demand upon their time and attention made by office seekers

and their supporters. The chief reason for an appointment was the political work done by the applicant and his supposed power to do more, and thus an appointment to an office in the civil list was regarded as a fit and proper reward for purely political and partisan service. No one can believe that such a system was calculated to produce a service fit for the only purpose·for which offices are created, viz.: the discharge of duties necessary to be performed in order that the public business may be properly and efficiently transacted. The continuous and systematic filling of all the offices of a great and industrious nation by such means, became conclusive proof in the minds of many that the nation itself had not in such matters emerged from the semi-barbarous state, and that it had failed to obtain the full benefits arising from an advanced and refined civilization.

The government, it was said, in such case where public offices are thus filled, is looked upon as an enemy's country, fit to be raided and conquered, and to obtain possession of it is a desirable thing, because all the offices, within the gift of those who administer it, are lawful spoil of war, and to be parceled out by the chiefs of the victorious party to their faithful followers in recognition of past political services, or in expectation of future support of the same nature. Possession of office under such a system is to be the reward of party fidelity and party service.

Contests between political parties under these circumstances, must, in the absence of some great and exceptional question, degenerate into mere struggles for the possession of the spoils of office and they necessarily bring out every low, selfish and sordid quality of the participants therein, and corruption and fraud at the elections become the usual accessories thereto. In these contests all principle is lost sight of, and a victory is regarded as a simple means by which to obtain or retain possession of office.

Views of this nature were held by numbers of men long before any legislation upon the subject had become possible. The prevailing system finally became, as was alleged, so

subversive of every right principle upon which the business of the public ought to be conducted, that the attention of congress was at length so far drawn to it as to result in the passage by it of the first statute upon that subject. It is not claimed that the federal legislation in regard to civil service reform has as yet proceeded very far, but it is a step in the direction of a change to another and, it is thought by many, a much better system of filling the public offices.

Legislation in the same direction as that contained in the act of congress was soon inaugurated in this state. It had been with us precisely as it had been with the federal authorities, and we were in no manner behind them in a practical, prompt and thorough adhesion to the truth of the maxim already quoted. The same force which had operated in the national congress and had caused the federal civil service legislation, appeared in our state capital, and legislation looking substantially to the same end as that of the acts of congress was enacted by our legislature.

The fact must be fully recognized that the duties connected with the vast majority of offices in both the federal and state governments are in no sense political, and that a proper performance of those duties would give no one the least idea whether the incumbent of the office were a member of one political party or another.

It was announced by its adherents and promoters as one of the most important of the principles of this new system of filling the civil offices that where the political views of the incumbent of public office could not rightfully affect or in any manner determine the means or method of the performance of his official duties, and where he stood in no confidential position towards a superior, that in such case his appointment to, or his tenure of such office should in no way depend upon or be affected by his "politics." Instead of the old method of obtaining an appointment, a new one was proclaimed, which was to be based solely upon merit, to be proved by an open, public and competitive examination, free to all candidates, and the person who was the best qualified, all proper circumstances

being considered, should be appointed. Legislation looking to this end was enacted in New York. The full benefits of such a system have not yet, it is said, been given by the legislation in question, because it does not go far enough. But it is claimed that even such as has been enacted tends to give permanency of tenure to the appointee, and thus to relieve him from constant anxieties as to his future means of livelihood, and to give him on that account more inclination and ambition to discharge his duties well and efficiently. As to the appointing power, it is also said that its tendency is to leave him at leisure to attend to the important duties of his own office without a constant drain upon his time and his temper in attending to the claims of office seekers.

If the system were to be carried out to its fullest extent by appropriate legislation, and if the laws thus enacted were to be enforced *bona fide* and with cordial heartiness by the men to whose hands it would necessarily be confided, it has been confidently predicted that the improvements in our entire civil service would be such that no unprejudiced citizen would ever give his consent to return to the old order of things.

I have stated in a somewhat summary manner the system which was in active operation concerning the appointment to civil office in the state and nation prior to the enactment of recent legislation upon the subject. That the former system was bad, very bad indeed, is a fact regarding which it is almost impossible to dispute. All intelligent, unprejudiced and disinterested opinion runs most strongly in that direction. Legislation of the character of that under discussion is in this country, and, as yet, somewhat experimental in its nature. It is experimental because it has been so little tried up to this time, but that the results, if the legislation be fairly carried out, will be immeasurably superior to those obtained under the old system, is a prediction most confidently made by those whose knowledge upon the subject is the greatest. It is somewhat difficult to imagine a worse than the old system of appointments to civil office. That a letter carrier should lose his position because his views upon the question of the tariff

were not in accordance with the ruling power seems to be the very height of absurdity.

An earnest desire for the general welfare would suggest a fair trial of this new system. A strict and full enforcement of the legislation already enacted in this state on that subject would be the only means of making the experiment.

But the defendant Diebold challenges the legislation in question, and asserts that it is unconstitutional on several alleged grounds, and, if in error as to that, he asserts that there are other reasons why it is inapplicable to his case. If the legislative acts under consideration violate in any particular the Constitution of our state, it is the duty of this court to so decide without regard to consequences. In determining that question, however, we must be guided in the discussion by the rules of construction which are so well known and which should control all courts. The act of the legislature must be plainly at variance with some provision of the Constitution before a court will so declare it. Doubtful questions will be resolved in favor of the validity of the legislative act.

The defendant alleges that the acts are unconstitutional because among other reasons they provide for the appointment by the governor, and for the confirmation by the senate, of three persons as state civil service commissioners, not more than two of whom shall be adherents of the same party. This last provision, preventing the formation of a civil service board of commissioners from one political party is cited as a violation of article 1, section 1 of our Constitution, which declares that "no member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or judgment of his peers." The provision is also claimed to be a violation of that part of section 6 of article 1, which declares that no person shall be "deprived of life, liberty or property without due process of law." Provisions of a nature similar to this act are contained in numerous statutes, which have been enacted since the adoption of our Constitution. Among the latest are those creating the state railroad commission and the

state board of arbitration. In appointing such commissioners the governor is not permitted to take them all from one party. None of these statutes has been held unconstitutional, and so far as I can discover this provision has never even been assailed as a violation of the Constitution. It is not conclusive of course, yet the fact that up to this time no such claim has been made in any legal discussion, while statutes containing provisions of this kind have been frequent, is something of an argument in favor of their validity.

We feel quite clear that such provisions are not in violation of the first section of article 1 of the Constitution. A citizen is not, within the meaning of this section, in such a case disfranchised nor is he deprived of any right or privilege secured to any other citizen of the state. No definition that could be given would probably include all the cases that such section might cover, and it is never well to attempt a general definition in matters of this nature. It is enough to say as each case presents itself that it is or is not included within the section.

The claim of defendant upon the facts of this case is that after two persons have been appointed from one political party, the legislature has no right to direct that in appointing a third, as one of three commissioners, such appointment must be made from some other than the same political party that furnished the other two. It is urged that the legislature has no such right, because the applicant for the third appointment might be a member of the same political party as the two already appointed, and that he has a constiutional right to be eligible for such appointment, and any statute which stands in the way of such right (save as a punishment for crime or as a consequence of a conviction thereof) must deprive him of the franchise or privilege of eligibility to office, and, therefore, amounts to his proscription to that extent, and is for that reason a violation of the Constitution. We think not.

The appellant bases his argument upon the proposition that every citizen has a right, which is protected by the Constitution, to be regarded as eligible to hold any office, unless the Constitution has itself prescribed certain qualifications for

such holding. He then asserts that the statute in question violates this constitutional right. It is not necessary, in the view we take of this statute, to decide upon the correctness of the claim as to the eligibility of the citizen to hold office as made by the appellant under the provisions of the Constitution. We will, simply for the purpose of this discussion, assume it to be correct. But we do not think that this statute violates any constitutional right of the individual. We think his right to be regarded as eligible to hold office under this statute is fully recognized when he stands on an equal footing with others of his class, all of whom are eligible. Where there are two offices, which members of the same party may fill, if he being a member of such party, is equally eligible with any other member of that party to fill either, his constitutional privilege to hold office is fully recognized and vindicated. It must be remembered that there is nothing in this statute which compels the appointment of even one member of any political party. It simply prevents the appointment of more than two from such party.

With the appointment of the third, another condition arises, and that condition prevents the selection being made from the ranks of the same political party from which the other two appointments have been made. Having been a member of the eligible class from which the other two persons were selected, and having thus had his constitutional chance of appointment equally with all others of that class, all being eligible, we cannot think that while two others from his class have been taken, and consequently he has been omitted in the two appointments, his eligibility for holding office extends by virtue of this section of the Constitution to the right of appointment as the third member of said commission in spite of the condition limiting the appointment to two from any one political party. In such case it cannot be truly said that eligibility to hold office depends upon party affiliation. The purpose of the provision is, of course, plain. It seeks to secure the appointment of persons who are not all of the same political views, and thus to provide for a representation in the body so appointed, of

different and probably conflicting interests in the state. We cannot believe that the section in question does or was intended to operate so as to prevent the execution of such a purpose so carried out.

The case of *Barker* v. *People* (3 Cow. 686) has been cited by counsel. That case holds that the act to suppress duelling, which provided as a punishment for sending a challenge, that the person so sending should, on conviction, be disqualified from holding any public office, was constitutional. The chancellor, in the course of his opinion, said he thought it entirely clear that the legislature could not establish arbitrary exclusions from office, or any general regulation requiring qualifications which the Constitution had not required. What he meant by such expressions is rendered clear by the examples he gives. Legislation would be an infringement upon the Constitution, he thought, which should enact that all physicians, or all persons of a particular religious sect, should be ineligible to hold office, or that all persons not possessing a certain amount of property should be excluded, or that a member of assembly must be a freeholder, *or any such regulation.*

But, in our judgment, legislation which creates a board of commissioners consisting of two or more persons, and which provides that not more than a certain proportion of the whole number of commissioners shall be taken from one party, does not amount to an arbitrary exclusion from office, nor to a general regulation requiring qualifications not mentioned in the Constitution. The "qualifications" which were in the mind of the learned chancellor were obviously those which were, as he said, arbitrary, such as to exclude certain persons from eligibility under any circumstances. Thus a regulation excluding all physicians would be arbitrary. But would a regulation which created a board of health and provided that not more than one physician from any particular school, or none but a physician should be appointed thereon, be arbitrary or unconstitutional as an illegal exclusion from office? I think not.

The purpose of the statute must be looked at, and the practical results flowing from its enforcement. If it be obvious

that its purpose is not to arbitrarily exclude any citizen of the state, but to provide that there shall be more than one party or interest represented, and if its provisions are apt for such purpose, it will be difficult to say what constitutional provision is violated, or wherein its spirit is set at nought.

The case is entirely different from that of *Attorney-General* v. *City of Detroit* (58 Mich. 213). The provision in that case was for the appointment of election inspectors, consisting of two persons from each of the two leading political parties, and it was held to be in violation of the Constitution of Michigan. There the law recognized but two political parties, and made it a necessity for the appointments to be made from and confined to members of those parties. An individual not a member of either was not eligible to appointment. In the case before us there is not a citizen in the state otherwise capable, who would not be eligible in the first instance to one of these appointments, and it is not until two have been made from one party that a member of such party is not eligible for appointment to the third place. There is no provision making it necessary to appoint two from the same party, or making it necessary to appoint some one who has been known up to that time as a member of any particular party. The legislation is in the direction of making the body thus appointed more representative, of different and diverse interests, than might otherwise be the case.

The legislative power, generally speaking, is unlimited, save as the Constitution has set bounds to it. It is difficult to see any constitutional objection to the legislation in question, so far as the section under consideration is concerned. No man's right to be regarded as eligible to hold office is, as we think, infringed upon by legislation which prohibits the taking of more than a certain number of the class to which he belongs, for the purpose of filling a commission composed of more than one individual. This is not the case of an attempt to restrict the right to vote for all offices that are elective by the people, so that what is termed minority representation might be attained even in purely elective offices. There is a constitu-

tional provision which gives to every male citizen qualified as therein specified by age and residence, the right to vote for all officers that now are or hereafter may be elective by the people. What is the correct construction of that section of the Constitution, and how far it applies in the direction of limiting the power of the legislature in regard to provisions for voting, are questions not now before us.   There is of course no analogy between the cases of elective offices and those where the office is to be filled by appointment, and no argument which rests for its foundation upon the constitutional provision for voting for elective officers, gives us any light upon the question under discussion.

In our judgment there is nothing in the first section of article 1 which invalidates this legislation.   It is equally apparent that the statute does not violate the provisions of section 6, of the same article, prohibiting any person from being deprived of life, liberty or property without due process of law.   He is not deprived of his life or his property by this statute.   Giving the widest definition to the word " liberty " as including the right to be eligible to hold office, the discussion already had shows that it has not been disregarded under this law.

Another objection to the validity of the statute is stated by the appellant.   He says the statute violates article 10, section 2, which provides that " All city, town and village officers, whose election or appointment is not provided for by this Constitution, shall be selected by the electors of such cities, towns or villages, or of such division thereof, or appointed by such authorities thereof as the legislature shall designate for that purpose."   His argument runs in this manner :   The statute provides that the mayor shall prepare general rules under which city officers are to be selected, which shall go into effect when approved by the state civil service commission. The powers of the local authorities to select city officers are,. therefore, as he argues, subordinated to the power of the state authorities.   We think the proposition cannot be maintained. The powers of the local authorities to select city officers,.

within the meaning of this section of the Constitution, are not subordinated to those of the state authorities by the mere necessity for the submission of the regulations concerning their appointment to the state board. The statute provides that the mayor is to prescribe such regulations for the admission into the civil service, as will best promote the efficiency thereof and ascertain the fitness of candidates in respect to character, knowledge and ability for the branch of the service into which they seek to enter. These regulations are to take effect upon the approval of the state commission. The mayor has in the first instance the sole right to prescribe regulations, but they are to be such as shall best promote the efficiency of the service, and ascertain the fitness of the candidates. The submission of such regulations to a state board before they are to take effect, does not interfere with the general powers of the local authorities to appoint to office. The state board cannot itself make the regulations or alter them. The regulations themselves can only be for the purpose of establishing efficiency and ascertaining the fitness of candidates. The same local authorities are to make the appointments that did so before the statute was passed. Means are simply taken to insure the appointment of fit and capable persons. The general plan provided in the statute would seem to be a fit and appropriate one for the purpose of accomplishing that result.

It is not denied that illegal or improper regulations may possibly be prescribed by the mayor and approved by the commission. This fact does not affect the validity of the statute. The rule or regulation which is alleged to be invalid may be brought before the court by some person whose rights have been affected thereby, and judgment may be thus given in regard to such validity. The defendant, Diebold, does not show that he has lost any right or that any right of his has been injuriously affected by any regulation adopted by the mayor and approved by the state commission, and he cannot, therefore, be heard upon a question which is, as to him, a mere abstraction.

Still another ground of invalidity is alleged by the appellant. He says that the statute conflicts with article 12, which pro-

vides for the taking of an oath of office by members of the legislature and all officers, executive and judicial, before they enter on the duties of their respective offices, which oath is therein set forth, and it is there stated that "no other oath, declaration or test shall be required as a qualification for any office of public trust."

The statute by which an applicant for appointment to a position in a public office is made to show his fitness therefor is claimed to constitute an illegal test within the meaning of this section. It is said that the legislature has no right to enact that a person who shall be appointed to a public office shall have the qualifications necessary to enable him to discharge the duties of such office, nor to provide that the fact that he does possess such qualifications shall be ascertained by a fair, open and proper examination. Nothing but the bare oath mentioned in the Constitution can be asked of any applicant for an appointive office is the claim of the appellant. We do not think that the provision above cited was ever intended to have any such broad construction. Looking at it as a matter of common sense, we are quite sure that the framers of our organic law never intended to oppose a constitutional barrier to the right of the people through their legislature to enact laws which should have for their sole object the possession of fit and proper qualifications for the performance of the duties of a public office on the part of him who desired to be appointed to such office. So long as the means adopted to accomplish such end are appropriate therefor, they must be within the legislative power. The idea cannot be entertained for one moment that any intelligent people would ever consent to so bind themselves with constitutional restrictions on the power of their own representatives as to prevent the adoption of any means by which to secure, if possible, honest and intelligent service in public office. No law involving any test other than fitness and ability to discharge the duties of the office could be legally enacted under cover of a purpose to ascertain or prescribe such fitness. Statutes looking only to the purpose of ascertaining whether candidates for an appoint-

ive office are possessed of those qualifications which are necessary for a fit and intelligent discharge of the duties pertaining to such office are not dangerous in their nature, and in their execution they are not liable to abuse in any manner involving the liberties of the people.

Most, if not all, of the provisions of the Federal and State Constitutions, which are of the nature of a bill of rights, were placed therein with reference to English history and the struggles for liberty which such history recorded. Declarations, oaths and tests as a condition for holding office had been frequently resorted to by the parliament of Great Britain for the purpose of promoting the prosperity of one religion or insuring the downfall of another.

In 1673, during the reign of Charles the Second of England, public opinion therein was highly excited. The king had theretofore chosen to issue a declaration of indulgence, which, in substance, dispensed with the execution of the penal laws against the Roman Catholics. Upon the re-assembling of parliament in that year the House of Commons denied the king's right to dispense with penal statutes in matters ecclesiastical, and unless the king renounced that right the House gave him to understand that it would grant no supply for the Dutch war. After much debate and negotiation the king yielded, canceled the declaration and promised that it should never be drawn into a precedent. The commons then extorted from the king his assent to what Macaulay has termed "a celebrated law," which continued in force down to the reign of George the Fourth. The law was known as the Test Act, and it provided that all persons holding any office, civil or military, should take the oath of supremacy, should subscribe a declaration against transubstantiation, and should publicly receive the sacrament according to the rights of the Church of England. Some years prior to this the parliament of 1662 had enacted a statute known as the Corporation Act. Under this act all magistrates had to disclaim the obligation of the covenant, and to declare their belief that it was not lawful upon any pretense to resist the king, and their abhorrence of

the traitorous position of taking arms by the king's authority against his person. The Act of Uniformity as to religion had also been passed, and every clergyman was bound to declare his assent to everything in the Book of Common Prayer, and was ordered to take an oath abjuring the solemn league and covenant and renouncing the principle of taking arms against the king. This brief statement is taken from the two Histories of England, by Macaulay and Hume. It cannot be doubted that the facts mentioned in them were present to the minds of the framers of our original Constitution from which this provision is extracted. They meant that no such oaths, declarations or tests as above-described, nor any other of a like nature, should be ordained as a condition for the holding of any public office. The Federal Constitution has declared that "no religous test shall ever be required as a qualification to any office or public trust under the United States." That provision undoubtedly was inserted for the same reasons which led to the insertion of the somewhat similar one of our State Constitution, and now under discussion. Its meaning has not been judicially stated that I am aware of, but we have the opinion of Mr. Justice Story that it was aimed to prevent the tests prescribed by such English statutes as I have above referred to. (2 Story on Const. §§ 1847, 1849.)

In this case we simply hold that the imposing of a test, by means of which to secure the qualifications of a candidate for an appointive office, of a nature to enable him to properly and intelligently perform the duties of such office, violates no provision of our Constitution.

Some other grounds have been urged for a reversal of this judgment, but after a careful examination of them we think they are not tenable for the reasons already sufficiently stated in the opinions of the courts below.

The judgment herein should be affirmed, with costs.

All concur, Ruger, Ch. J., in result.

Judgment affirmed.