[Civ. No. 1960. Fourth Appellate District.—July 2, 1936.]

JOHN D. CORNELL, Appellant, v. CHARLES H. HARRIS et al., Respondents.

Charles B. DeLong, Claude L. Chambers and Hugh Sanders for Appellant.

Thomas Whelan, District Attorney, Frank T. Dunn, Assistant District Attorney, and Carroll H. Smith, Deputy District Attorney, for Respondents.

Everett W. Mattoon, County Counsel (Los Angeles), and Fred M. Cross (Deputy County Counsel), as *Amici Curiae* on Behalf of Respondents.

MARKS, J.—Plaintiff is a deputy sheriff of San Diego County. He took office on January 7, 1935. Charles H. Harris, Mrs. S. M. Marshall and Stanley M. Gue compose the civil service commission of the county of San Diego. Theodore T. Sharp is the director of personnel of the civil service commission.

This action was brought by plaintiff for declaratory relief to determine his right to hold his office as deputy sheriff under the civil service rules which went into effect after he took office.

The county of San Diego is operating under a charter which was adopted by the electors of the county on November 8, 1932, and which was approved by the legislature at its session in 1933. (Stats. 1933, p. 2814.) By its terms the charter took effect on July 1, 1933.

Amendments to the charter were adopted by the voters of San Diego County on November 6, 1934, were approved by

the legislature at its session in 1935 and went into effect July 1, 1935. These amendments provided a complete plan for civil service and its administration. The board of supervisors passed an ordinance in May, 1935, effective July 1 of that year, which provided, among other things, for the office held by plaintiff and fixed the salary. It did not attempt to establish a civil service for the county.

The defendants gave notice that examinations would be held on November 1, 1935, to establish eligible lists for many offices under the civil service, including the one held by plaintiff. On November 21, 1935, an original proceeding in prohibition was instituted in this court, which stayed the proceedings pending determination of the questions involved in the two cases.

Section 19 of the charter, as originally adopted, provided as follows:

"All elective and appointive officers shall have the power to appoint such deputies and employees as the Board of Supervisors may, by ordinance, authorize; but all such appointments, when made by appointive officers, shall be subject to confirmation by the Board of Supervisors.

"All such deputies and employees shall hold office and may be removed at the pleasure of the appointing power." (Stats. 1933, p. 2821.)

Plaintiff advances three main questions which it is necessary for us to consider on this appeal. (1) That as he was appointed, qualified and took office under the provisions of the charter which we have just quoted and before the civil service provisions of the charter became effective, he had a vested right to his office of which he could not be deprived in the manner contemplated here; (2) that the incorporation in the charter of a complete plan for civil service and for its administration is unconstitutional and void as the Board of Supervisors is required to set up the civil service by ordinance; (3) that the charter provisions attempting to delegate to the civil service commission power to determine the qualifications of officers are unconstitutional and void as an attempt to delegate legislative powers to that board.

Plaintiff's first contention is answered by the case of *Boyd* v. *Pendegast*, 57 Cal. App. 504 [207 Pac. 713], where it is said concerning the removal of a police officer of the city of Los Angeles:

"The possession of an office, or the enjoyment of employment with the government, or under any of its agencies, does not confer a vested property right of any quality whatsoever. The more ancient offices to which the common law attached the property character of incorporeal hereditament find no legal counterpart under the political systems of government in this country. (*Connor* v. *City of New York*, 5 N. Y. 285; *Trimble* v. *People*, 19 Colo. 187 [41 Am. St. Rep. 236, 34 Pac. 981]; *Matter of Carter*, 141 Cal. 316 [74 Pac. 997].) It is not necessary here to consider whether, as between the office holder and a stranger to the appointing power, there may be, in abstract contemplation, a qualified property right which may be subject to damage. In general, then, it follows necessarily that under whatever procedure is adopted to work the removal of a person from office, the constitutional question, as to lack of due process of law, cannot be involved. Whether for cause or without cause, where the removal of an officer is accomplished after full compliance with existing regulations affecting the matter, no ground is left upon which to found any action against the removing power." It should be observed that neither in the Boyd case nor in the instant case is the removal from office of a constitutional officer involved.

In asserting that he is about to be deprived of his office plaintiff either does not understand the procedure which the civil service commission proposes to follow or he must be said to admit in advance of the examination that he does not possess the necessary qualifications to pass it. That body does not propose to remove him from office. It merely proposes to permit him to so demonstrate his fitness to hold office, that he will acquire a permanent civil service status so that he may hold his office free from political restraint, entanglement and domination, and not be removed except in the manner provided by law. If he cannot pass the examination with sufficient credits to permit his appointment, that of itself should permit his removal so that he may be replaced by a more competent person. The examination is the test of his fitness to hold office. It is the procedure established by law by which he may be either reappointed or removed. The result depends entirely upon himself. If he cannot pass the examination he cannot complain at being replaced by

another. (See *Gibson* v. *Civil Service Commission*, 27 Cal. App. 396 [150 Pac. 78].)

Under his second ground for reversal of the judgment plaintiff urges that as the Constitution vests in the supervisors the exclusive right to establish by ordinance the machinery, rules and regulations of civil service, the provisions of the charter attempting to accomplish those ends were void, and as the board of supervisors had not passed any such ordinance when defendants attempted to call and hold the civil service examination judgment should have gone for plaintiff.

The provisions of section 7½ of article XI of the Constitution which are material here are as follows:

"It shall be competent, in all charters, framed under the authority given by this section to provide, in addition to any other provisions allowable by this Constitution, and the same shall provide, for the following matters:

"1. For boards of supervisors and for the constitution, regulation and government thereof, . . .

"5. For the fixing and regulation by boards of supervisors, by ordinance, of the appointment and number of assistants, deputies, clerks, attaches and other persons to be employed, from time to time, in the several offices of the county, and for the prescribing and regulating by such boards of the powers, duties, qualifications and compensation of such persons, the times at which, and terms for which they shall be appointed, and the manner of their appointment and removal; . . . "

The civil service provisions of the San Diego County charter are so similar to those of the charter of Los Angeles County that for the purpose of this decision they may be considered identical. There have been decided several cases involving the provisions of the Los Angeles County charter. While the precise question we are considering does not seem to have been urged in any of them, still in all of them it was assumed, if not held, that the charter provisions were valid and within the constitutional requirements. (See *People* v. *McAleer*, 33 Cal. App. 135 [164 Pac. 425]; *Cronin* v. *Civil Service Commission*, 71 Cal. App. 633 [236 Pac. 339]; *Fee* v. *Fitts*, 108 Cal. App. 551 [291 Pac. 889]; *Ey* v. *Fitts*, 112 Cal. App. 109 [296 Pac. 327].)

In the foregoing cases the courts, by inference at least, upheld the regulations of the civil service contained in the Los Angeles County charter. Thus for more than twenty years those enactments have been regarded as constitutional and have been given full force and effect. They have been followed in that county. ''Contemporaneous exposition is in general the best.'' (Sec. 3535, Civ. Code. See, also, *Riley* v. *Forbes,* 193 Cal. 740 [227 Pac. 768]; *Riley* v. *Thompson,* 193 Cal. 773 [227 Pac. 772].) Thus if those cases and the contemporaneous construction placed on the provisions of the Los Angeles County charter do not decide the question before us they at least furnish strong arguments for sustaining the civil service provisions of the San Diego County charter.

■ It is a primary rule of construction that constitutional provisions must be liberally construed to give them effect and to achieve the real purpose of their enactment. (*Sheehan* v. *Scott,* 145 Cal. 684 [79 Pac. 350]; *Bakkenson* v. *Superior Court,* 197 Cal. 504 [241 Pac. 874].) In *Gibson* v. *Civil Service Commission, supra,* it is said:

''The most important rule, however, to be observed in giving construction to ambiguous or apparently conflicting provisions of a constitution is that the interpretation must not be narrow, but broad, and that the object to be accomplished by the law is not to be left out of view.''

We have been cited to but one case in which the precise question we are considering has been decided. In 1914, while a judge of the Superior Court of Los Angeles County, the Honorable Curtis D. Wilbur, later chief justice of the Supreme Court of California and now a member of the United States Circuit Court of Appeals, Ninth Circuit, filed an opinion in the case of *Norton* v. *Evans* in which the question was presented and decided. The opinion is clear and the argument convincing. We adopt the following portion of it:

''This subdivision 5 (Sec. 7½, Art. XI, Const.) provides for the fixing and regulation by boards of supervisors by ordinance, of the powers, duties, qualifications, compensation, the times at which and the terms for which they shall be appointed, and the manner of their appointment and removal. That is, the boards of supervisors are to regulate the appointment, fix the qualification, fix the term of office, time at which they shall be appointed, and the manner of their appointment

and removal. It would seem that there is nothing left for civil service to operate on. The board would not only determine the qualifications which, as we have heretofore indicated, might be confined properly to the legislative function in that regard, but also the manner of their appointment and the manner of their removal, and regulate the same by ordinance. Is the vesting in civil service commissioners of the administrative and ministerial function of determining the qualifications of the individual officers and the removal thereof, a power that is herein expressly directed to be vested in the board of supervisors? If so, and if this is not done, what is the effect of the failure so to do? Before determining the question and in passing it may be noticed that section X of the charter provides that boards of supervisors 'shall have all the jurisdiction and powers which are now and which may hereafter be granted by the Constitution and the laws of the state of California or by this charter.' If the civil service provision in this respect with reference to the deputies and so forth mentioned in subdivision 5 is ineffectual, then this general provision of the charter would probably be sufficient to adopt into and incorporate therein the provisions of subdivision 5, section 7½.

"Is there anywhere in the Constitution any provision which in any way modifies or controls the power of the supervisors as specified in subdivision 5, section 7½? Or, in other words, is there any authority given anywhere by the Constitution to the charter framers to control, modify or limit in any manner the broad general powers directed to be vested in them by said subdivision 5? It will be noted that subdivision 1 of this section deals with boards of supervisors and provides: 'For boards of supervisors and for the constitution, regulation and government thereof, for the times at which and the terms for which the members of said board shall be elected, for the number of members, not less than three that shall constitute such boards, for their compensation and for their election, either by the electors of the counties at large, or by districts; provided, that in any event said board shall consist of one member for each district, who must be a qualified elector thereof.'

"What is meant by the expression 'and for the constitution, regulation and government thereof'? The term 'constitution' probably merely indicates the manner in which the

board shall be made up or established. But what significance is to be attached to the words 'regulation and government thereof'? How are the supervisors to be regulated? How are they to be governed? The general law authorizes them to establish rules of procedure. This would be an implied power in any event. The constitutional provision here is that the charter may provide for the regulation and government of boards and supervisors. This does not relate to the number of members of the board, nor to their compensation, nor to their election nor to the times of elections nor to the terms for which they shall serve, for each of these elements is specifically mentioned. Bearing in mind that the charter is the means by which the people express their will concerning their local government by which they are to express their principles of local government, by which they are to regulate their affairs and conserve their own interests, can the people impose any restrictions on the broad powers of the board of supervisors, and does this constitutional provision for the regulation and government of boards of supervisors authorize the people in their charter to hedge about or restrict the board in the exercise of the general powers conferred upon them? In determining this question let us look for a moment at the character of the charter authorized by the Constitution, and let us remember the history of lawmaking with relation to the powers of boards of supervisors. Under the Constitution of 1849, the power to create local officers was vested in county boards of supervisors. After the Constitution of 1879 the Legislature at various times attempted to delegate to boards of supervisors the power to determine the number of county officers and their compensation. It is a matter of political history that boards of supervisors utilized the power thus conferred on them to dominate the various county officers. No county officer could well refuse to appoint such deputies as the board of supervisors requested him to appoint when they had the power to fix the number of his deputies, increasing or diminishing that number, and fix the compensation of his deputies. By decreasing the number or lowering the compensation they could virtually prevent him from performing the duties of his office, and so hamper him that he would quickly yield to the political pressure brought to bear upon him by the board of supervisors. The Supreme Court held that the Consti-

tution of 1879 did not authorize this delegation of power and that such laws were unconstitutional. Since that time the Legislature has exercised that power until the amendment of 1910 which authorized the formation of county charters. But in taking back this power once before exercised by county boards of supervisors, the people had just reason to apprehend the danger of centralizing in boards of supervisors the enormous power, not only to fix the number of deputies each county officer may have, but also the compensation thereof. If the supervisors, absolutely unhampered by any restriction upon the power to create deputyships and fix their compensation may increase or diminish their compensation at will, as well as increase or diminish the number of deputies, we have at hand all the material to give us the very worst feature of the spoils system so graphically described by Justice Peckham. (*Roger* v. *Common Council*, 123 N. Y. 173 [25 N. E. 274, 9 L. R. A. 579].) Supposing the charter had provided in general terms that the supervisors in the exercise of their power of appointment should be guided by what is known as civil service rules. That expression has grown to have a definite meaning, and in fact is used in the constitutional amendment of 1910, article 16, section 20. It is adopted in various charters in the state and has been used by the federal government for a quarter of a century or more. Would this general regulation be such a regulation as is contemplated by the Constitution to be made by the charter framers in dealing with the supervisors? Can we give any effect to the word 'regulation' or any effect to the word 'government'? (and it is our duty in construing statutes to give effect to every word, if it may be done), if we do not give it at least this much effect. If the people are greater than the supervisors, if the powers in the people are more important and far-reaching than the powers of the boards of supervisors, if supervisors are the creatures of the people and the people are the creators thereof, have we anything less here than the people of the state saying to the people of the county, 'You may provide for the creation of a board of supervisors and may regulate and govern it by such broad restrictions or rules as in your judgment are meet and proper.' And if these expressions have their broad general significance, it may and necessarily must control in smaller minutiae relating to the duties of boards of super-

visors. If the proposition here advanced that the authority to regulate and govern the supervisors given to the people of the county by the Constitution is broad enough to authorize the imposition upon the board of regulations circumscribing its powers and duties with reference to county officers is a debatable one, we are bound under the rules hereinbefore stated to hold the attempt so to do in the charter to be a valid exercise of the power of the people, for it is only in the case of a clear violation of the Constitution that we are justified in declaring it void.

"It is not to be thought that the people of the state in authorizing the people of the county to frame a county charter intended to make them the powerless and unhappy victims of the spoils system and to deprive them of the power to impose upon their servants the obligation to fill public office with reference to merit, and not with reference to the partisan politics, particularly when at the same time the people of the state adopted two constitutional amendments which had for their sole purpose the validating of civil service provisions in the charter of San Francisco. (Sec. 8½, art. XI, sec. 16, art. XX.) In construing the broad powers given the people to govern and regulate their supervisors by charter (sec. 7½, subd. 1, art. XI) we may well paraphrase the language of Justice Peckham hereinbefore quoted:

" 'Looking at it as a matter of common sense, we are quite sure that the framers of our organic law never intended to oppose a constitutional barrier to the right of the people (of the county) through their . . . (Charter) to enact laws (regulations) which should have for their sole object the possession of fit and proper qualifications for the performance of the duties of a public office on the part of him who desired to be appointed to such office . . . The idea cannot be entertained for one moment, that any intelligent people would have consented to so bind . . . (the people of the county) with constitutional restrictions on the power of their own . . . (board of freeholders in framing a charter) as to prevent the adoption of any means by which to secure if possible, honest and intelligent service in a public officer . . . ' "

■ The third contention of plaintiff needs little consideration as the functions of the civil service commission are administrative, ministerial and executive and not legislative.

Plaintiff's argument is disposed of in *Gaylord* v. *City of Pasadena,* 175 Cal. 433 [166 Pac. 348], as follows:

"Even a casual observer of governmental growth and development must have observed the ever-increasing multiplicity and complexity of administrative affairs—national, state, and municipal—and even the occasional reader of the law must have perceived that from necessity, if for no better grounded reason, it has become increasingly imperative that many *quasi-*legislative and *quasi*-judicial functions, which in smaller communities and under more primitive conditions were performed directly by legislative or judicial branches of the government, are intrusted to departments, boards, commissions, and agents. No sound objection can longer be successfully advanced to this growing method of transacting public business. These things must be done in this way or they cannot be done at all, and their doing, in a very real sense, makes for the safety of the republic, and is thus sanctioned by the highest law. For, as the Supreme Court of the United States declares: 'Indeed, it is not too much to say that a denial to Congress of the right, under the Constitution, to delegate the power to determine some fact or the state of things upon which the enforcement of its enactment depends, would be "to stop the wheels of government" and bring about confusion, if not paralysis, in the conduct of the public business.' (*Union Bridge Co.* v. *United States,* 204 U. S. 364 [27 Sup. Ct. 367, 51 L. Ed. 523].)" (See, also, *Coehlo* v. *Truckell,* 9 Cal. App. (2d) 47 [48 Pac. (2d) 697].)

Judgment affirmed.

Barnard, P. J., concurred.

Jennings, J., being absent, did not participate herein.