STATE OF IOWA, EX REL. R. W. JONES, Appellant, v. B. M. SARGENT ET AL., Appellees.

1   **Municipal corporations:** APPOINTMENT OF FIRE AND POLICE COMMISSIONERS: DISCRETION OF MAYOR: STATUTES. The statute authorizing mayors in certain cities of the first class to appoint boards of fire and police commissioners places some discretion in the mayor in the matter of appointing two members from the dominant political party; and where there was no intentional disregard of the law or abuse of discretion the court will not interfere with his action: As where the mayor offered the second position on the board to several members of the dominant party who refused the same, and he afterward appointed a member of the minority party, thus giving two of the three members of the board to the minority party.

2   **Same:** CONSTITUTIONAL LAW: LIMITATION OF POLITICAL RIGHTS. The statute authorizing the mayor in cities of the first class to appoint fire and police commissioners from the two leading political parties is not unconstitutional, on the ground that it forces an elector who might desire such appointment to ally himself with

the one or the other of the two dominant parties, thus destroying his free agency in matters political.

**Same:** UNIFORMITY OF LAWS.   Nor is the statute unconstitutional as fixing a political test as a qualification for office, or as granting to any citizen or class of citizens privileges not open to all on the same terms.

**Same:** REASONABLENESS: CONSTITUTIONAL GUARANTY.   Nor is the same objectionable as creating an arbitrary and unreasonable classification of those who are entitled to appointment under the law; nor is it repugnant to the spirit of our form of government. .
Weaver and Evans, JJ., dissenting.

*Appeal from Pottawattamie District Court.*—HON. N. W. MACY, Judge.

TUESDAY, JANUARY 11, 1910.

QUO WARRANTO proceedings to test the validity of the defendants' appointments as members of the Board of Fire and Police Commissioners of the city of Council Bluffs and to oust the defendants from their positions as such. Relator pleads that he was and is Chief of the Fire Department of the aforesaid city, and that defendants were threatening to interfere with him in the discharge of his duties. The trial court dismissed the petition, and plaintiff appeals.—*Affirmed.*

*Saunders & Stuart,* for appellant.

*Jerry Sullivan* and *S. B. Wadsworth,* for appellees.

DEEMER, C. J.—Relator was duly chosen chief of the fire department of the city of Council Bluffs in the year 1906, and at the time of the commencement of this suit was acting as such. On or about April 8, 1907, the then mayor of said city appointed defendants . B. M. Sargent, a Republican, and Hubert Tinley and L. Zurmuehlen,

Democrat, as members of the board of fire and police commissioners for the city under the provisions of Acts 32d Gen. Assem., chapter 29, and Acts 29th General Assembly, chapter 31, all appearing now as chapter 2A, title 5, of the Code Supplement of Iowa.. It is alleged that the law under which the appointments were made is unconstitutional and void, and that the members so appointed were not qualified to serve. It is further alleged that defendants were about to interfere with plaintiff in the performance of his duties as fire chief, and that their act in so doing was without authority of law. That the exact questions presented may be fully understood, we here quote the provisions of the statutes involved:

Sec. 679a. . . . There is hereby created and established a board of police and fire commissioners in cities of the first class and cities under special charter which, according to any state or national census heretofore or hereafter taken, are shown to have a population of more than twenty thousand.

Sec. 679b. Said board of police and fire commissioners shall consist of three members, who shall be citizens of the state of Iowa, and who shall have been residents of the city in which they are appointed for more than five years next preceding their appointment; they shall, except as hereinafter specified, hold their office for six years and until their respective successors have been appointed and qualified. All vacancies in such board by death, resignation, removal or for any other cause, shall be filled as soon as practicable in the same manner as provided for appointment. Said commissioners shall receive no compensation for their services.

Sec. 679d. Immediately upon the taking effect of this act the mayor of such city shall appoint said board of police and fire commissioners, who shall be confirmed by the city council, and the said commissioners so appointed shall hold their office, one of them until the first Monday in April, 1904, one of them until the first Monday in April, 1906, and one of them until the first Monday in April, 1908, and on the last Monday in March, 1904, and

on the same day in each even numbered year, thereafter, the mayor shall appoint one commissioner in such city to take the place of the commissioner whose term of office expires the first Monday in April following such appointment, and the members so appointed shall serve for the term of six years following the said first Monday in April. The chairman of the board for each biennial period shall be the member whose term first expires. The said commissioners shall be selected from the two leading political parties, so that, as far as practicable, two members of the board shall be members of the dominant political party and one member of the board shall be a member of the political party next in numerical strength, as shown by the votes cast at the last state or national election. And any commissioner who during his term of office becomes a candidate for or accepts any other place of public trust or emolument, or who during the same period knowingly consents to his nomination for any office elective by the people, or fails to publicly decline the same within twenty days succeeding such nomination, shall be deemed to have thereby vacated his office, and a successor shall be appointed as provided in this act. The majority of said board shall constitute a quorum for the transaction of business. Any of said commissioners may be removed for misconduct or malfeasance in office, by the mayor of said city, with the consent and approval of a majority of the city council.

It will be observed that the law applies only to cities having a population of more than twenty thousand; that the mayor shall appoint the board thereby created, which shall consist of three members, who shall be citizens of the state and residents of the city for more than five years next preceding their appointment; and that they shall be selected from the two leading political parties, so that so far as practicable two members shall be of the dominant political party and one of the next in numerical strength, as shown by the votes cast at the last state or national election. It is conceded in argument that the city of Council Bluffs had a population exceeding twenty thousand when the appointments were made, that the two dominant polit-

ical parties were the Republican and Democratic, and that. the Republican party was the dominant one in the city as shown by the last preceding election. It also appears that, while two Democrats were named instead of two Republicans, the place was offered by the mayor to four Republicans before he named the second Democrat, and that these four men declined the appointment and refused to serve as members of the commission. We quote this admission from the record:

It is admitted of record that, at the time the fire and police commission were appointed by Donald Macrae, there were more than a thousand persons who were members of the Republican party in the city of Council Bluffs, Iowa, and all of them voters, and that prior to making said appointments that the mayor of the city of Council Bluffs requested four members of the Republican party to act as members of the fire and police commission, and that they declined the appointment and requested not to name them members of said commission. It is admitted of record that there are numerous voters in the city of Council Bluffs, Iowa, who had been residents of said city less than five years at the time the police and fire commission was appointed.

The exact points relied upon for a reversal are so succinctly stated in the brief of appellant's counsel that we here quote therefrom as follows:

(1) Defendants were appointed in violation of law; two of them being members of the Democratic party, whereas the Republican party was, at the time of their appointment, the dominant political party. (2) Chapter 2A, title 5, of the Supplement, is void because it requires a political test as a qualification for the right to be appointed to the office of member of the board of police and fire commissioners. (3) Section 2A, title 5 of the Supplement is void because it controverts section 1, article 2, of the Constitution of Iowa, by placing a burden and penalty upon electors otherwise qualified by hindering and hampering them in their freedom of choice as such electors.

These we shall take· up in order.

The general qualifications for appointment are stated in section 679b as follows:    They shall be citizens of the state and residents of the city for more than five years next preceding their appointment. · That defend-ants possessed these qualifications is · admit-ted.    But it is further provided in section 679d that "they shall be selected from the two leading political parties, so that, as far as practicable, two members of the board shall be members of the dominant political party and one member of the board shall be a member of the political party next in numerical strength as shown by the votes cast at the last state or national election." It will be ob-served that this last provision does not go to the qualifica-tions for the office.    It says they shall ·be selected by the mayor in the manner directed, and contains a qualification to the effect that so far as practicable they shall be made up as directed.    Manifestly some discretion is left in the appointing power, and primarily he is to determine whether it is practicable to have the board selected as indicated.    In the absence then of proof, either . direct or circumstantial, that the mayor was guilty of some fraud or collusion or was acting perversely and in open disregard of the law, his discretion can not be interfered with by the courts.    It seems that he offered the position to four Republicans be-fore selecting the second Democrat, and evidently was en--. deavoring to find a proper appointee of the Republican faith.    The proffer of the place was· not accepted, and the mayor then turned to a second Democrat, who, we must as-sume, in the absence of a showing to the contrary was deemed better fitted than some Republicans who might be induced to accept.    As the members appointed were each and all qualified and as there is no showing of any fraud or favoritism on the part of the mayor or any intentional disregard of the law or abuse of discretion, we are not

1. MUNICIPAL CORPORATIONS: appointment of fire and police com-missioners: discretion of mayor: statutes.

justified in sustaining the first point made by appellant's counsel. *Sanborn v. Mason City*, 114 Iowa, 189, is not in point. If there were no qualifications upon the duty to select two from the majority and one from the minority party, we might have a different situation. But here there are certain qualifications, and a discretion is vested in the mayor with regard to this very matter.

II.   Claim is made that, as the statute limits the appointees to membership of the two leading political parties, it is unconstitutional and void because it grants special privileges and immunities, because

2. SAME: constitutional law: limitation of political rights.

it is not uniform in its operation, and because it interferes with and lessens the right or franchise conferred upon electors. The law is certainly uniform in its operation, and, if there be anything in the argument against the validity of the law, it is to be found in that part of it which limits the mayor's choice to the members of the two leading political parties. The electors are not hampered in their choice, for they have no right to vote for members of the board. They do have free and equal opportunity to vote for the appointing power, the mayor, and there is no claim that the members of such a board can not be created by appointment at the hands of some other official. The only point, if there be any, to the last proposition, is that it forces an elector, if he would stand any show of appointment to the board, to ally himself with one or the other of the two dominant parties, thus destroying his free agency in matters political. There is no merit, as we think, in this argument. In order to secure nonpartisan action, it is very common for Legislatures in creating boards and commissions to provide that the members thereof shall not all be of the same political faith and to direct that they shall be selected from the dominant political parties. We have never heard it claimed before that this in any manner interfered with the privileges of electors or imposed any unconstitutional restraints

upon them. It certainly does not add any new qualifications, nor to our minds does it interpose any restraint. In no election may a voter cast his ballot for whom he will. He is of necessity limited in his choice to those who have the necessary qualifications to hold office, and these are of necessity arbitrary and sometimes perhaps unreasonable. True, an elector who did not ally himself with one or the other of the dominant parties could not be appointed to membership upon the board; but there is no such thing as a right to hold office. This is a mere privilege at all times within the control of the Legislature, save where limited by some constitutional provision. We shall presently see that there is no such limitation in our fundamental law.

We shall and must assume that an elector, in exercising his privileges at the polls, does so from some higher motive than to place himself in line for a future appointment to some office. If the desire to hold office predominates, then he may easily qualify himself by voting a party ticket, and, if that be the dominant idea with him, he is not deprived of much when compelled, in order to place himself in line, to vote a party ticket. No case has been called to our attention which holds that such a law as is now under consideration is invalid because it interferes with the freedom or rights of an elector. Appellant relies upon the expression found in *Edmonds v. Banbury,* 28 Iowa, 267, reading as follows: "Those whom the Constitution declares to be electors can not be disfranchised; and not one jot or tittle can lawfully be added to or taken away from the qualifications which the Constitution prescribes." Granted that this expresses a correct rule of law, which it undoubtedly does, still there is nothing in the statute under consideration which in any manner attempts to fix the qualifications of electors. *Attorney-General v. Board,* 58 Mich. 213 (24 N. W. 887, 55 Am. Rep. 675), also relied upon by appellant, is not in point for the reason that the constitutional provision is quite different

in Michigan from our fundamental law, in that it provides, in substance, that no other oath than the one prescribed, declaration, or test shall be required as a qualification for any office or public trust.

III.   The point most relied upon by appellant is that the law in question sanctions or requires a political test as a qualification for office, creates special privileges, and is in contravention of section 6 of article 1 of the Constitution, which provides, in substance, that the General Assembly shall not grant to any citizen or class of citizens privileges or immunities which upon the same terms shall not equally belong to all citizens.   That the act in question does not violate this constitutional provision is held in *Shaw v. City of Marshalltown,* 131 Iowa, 128, to which is appended a valuable note containing reference to the more recent cases upon the propositions involved.   See, also, *Goodrich v. Mitchell,* 68 Kan. 765 (75 Pac. 1034, 64 L. R. A. 945, 104 Am. St. Rep. 429, 1 Am. & Eng. Ann. Cas. 288).   The *Shaw* case is also reported with annotations in 10 L. R. A. (N. S.) 825, and it appears from these various annotations that the rules therein announced are in accord with the great weight of authority upon the question.   That is to say, it is there held that the constitutional provision relied upon does not apply to legislative enactments fixing the qualifications for municipal office.

Recognizing the force of this decision, appellant's counsel say:   "In view of the decision of this court in the *Soldiers' Preference* case, we shall consider only one question in reference to this branch of the argument, and that is our claim that the classification made is arbitrary and unreasonable; that it is not only violative of the expressed Constitution, but is utterly repugnant to the spirit of our institutions, and, if carried to its logical and legitimate

*Marginal notes:*
3. SAME: uniformity of laws.
4. SAME: reasonableness: constitutional guaranty.

conclusions, utterly subversive and destructive of free government." The right to hold an act of the Legislature invalid because repugnant to the spirit of our institutions and destructive of free government is a very delicate and perhaps doubtful one. Of course, the Constitution guarantees a republican form of government, but there is nothing in the Constitution or in a republican form of government which prevents the Legislature from fixing qualifications for office. This matter of declaring a statute invalid because of some implied limitations upon the power of the Legislature was fully considered in *Eckerson v. City of Des Moines,* 137 Iowa, 453, and what is there held need not be repeated here. It can not be said as a matter of law that any qualification for office fixed by the Legislature is arbitrary or oppressive, or so much so as to be set aside by the courts. Wherever qualifications are fixed there is a division into classes; that is to say, there is a class which may serve, and another which may not. Whenever qualifications are fixed, there is a discrimination, a granting of special privileges, and a denial of the right of some to hold office, and it is not for the courts to say that such provisions are arbitrary or unreasonable. The fixing of qualifications for office is a legislative and not a judicial function.

Appellants rely, in this connection, upon *Evansville v. State,* 118 Ind. 426 (21 N. E. 267, 4 L. R. A. 93); *Attorney-General v. Detroit, supra; Bowden v. Bedell,* 68 N. J. Law, 451 (53 Atl. 198); *Rathbone v. Wirth,* 150 N. Y. 459 (45 N. E. 15, 34 L. R. A. 408); and *Mayor v. State,* 15 Md. 379 (74 Am. Dec. 572). In the *Evansville* case it is held the Legislature can not make a requirement of five year's residence as a qualification for office, and that a provision to the effect that officers and patrolmen of a fire and police department should be selected equally from the two leading political parties is void. In the *Shaw* case, *supra,* we disregarded that decision, and the

court which pronounced it in a subsequent opinion in *Hovey v. State,* 119 Ind. 386 (21 N. E. 890), held that "it is within the authority of the Legislature, by virtue of its general power, to require that the officers of this class shall be selected from the different political parties, or that they shall be persons of peculiar skill and experience." *State v. Bedell* does not decide the point, although the question is mooted and some expressions used which indicate that the New Jersey court regarded such qualifications for office as are provided in the act before us inimical to our form of government. *Mayor v. State* really does not decide the question. The judges in that case were of the opinion that the qualifications fixed by the act could not be understood, so they expressed no opinion regarding the matter, and upon the validity of another qualification the judges were equally divided in opinion. *Attorney-General v. Board of Councilmen,* 58 Mich. 213 (24 N. W. 887, 55 Am. Rep. 675), involved the appointment of election inspectors by a board to be appointed, consisting of two persons from each of the two leading political parties. The act providing therefor was held unconstitutional because of its interference with the rights of electors, in that it imposed new conditions on the right of suffrage. The constitutional limitation involved there provided that "no other oath, declaration or test should be required as a qualification for any office or public trust." Membership of a political party was not one of the permissible tests under the Constitution. We have no such constitutional provision. *Rathbone v. Wirth,* 150 N. Y. 459 (45 N. E. 15, 34 L. R. A. 408), gives support to appellant's contention, but the case was decided by a bare majority of the court. On the other hand, it is very clear that a residential test is not obnoxious to any clause of our Constitution. *Edmonds v. Banbury,* 28 Iowa, 267. Moreover, in the absence of constitutional limitation imposing restraints upon the Legislature with reference to qualifi-

cations for office, it is held in many cases that political tests or other qualifications may be used. *State v. Bemis,* 45 Neb. 724 (64 N. W. 348); *State v. Smith,* 35 Neb. 13 (52 N. W. 700, 16 L. R. A. 791); *Rogers v. Council,* 123 N. Y. 173 (25 N. E. 274, 9 L. R. A. 579); *People v. Hoffman,* 116 Ill. 587 (5 N. E. 596, 8 N. E. 788, 56 Am. Rep. 793); *Patterson v. Barlow,* 60 Pa. 54; *Commonwealth v. Plaisted,* 148 Mass. 375 (19 N. E. 224, 2 L. R. A. 142, 12 Am. St. Rep. 566).

It must be remembered, in this connection, that we have no constitutional provision fixing the qualifications for municipal office. The Constitution does provide, however, that no religious test shall be required as a qualification for any office of public trust. See section 4 of article 1 of the Bill of Rights. In this respect it differs from the fundamental law of many of the other states, which provide that no religious or political test shall be required. There is no absolute right to hold office or to be a candidate therefor; and the Legislature, in the absence of constitutional prohibition, has plenary power in fixing the qualifications therefor. The act in question is largely advisory in character, and the requirement that the commissioners shall be selected from the two dominant political parties was intended to make the board when appointed nonpartisan in character and to give the minority representation. The office is not one created by the Constitution, but is municipal in character, and the Legislature in creating such an office, and in delegating its power to these public corporations, has the right to say who shall exercise the functions so delegated. The office is not elective, but appointive, and exists only by reason of legislative enactment, and there is, as was said by Justice Peckham in the *Rogers* case, *supra,* no analogy between the cases of elective officers and those where the office is to be filled by appointment, and no argument which rests for its foundation

upon the constitutional provision for voting for elective officers gives any light upon the question under discussion.

We need not pursue the argument further. The case is governed in principle by *Shaw v. Marshalltown, supra,* and other like cases. No constitutional provision is violated by the act in question, and we are constrained to hold that, as applied to municipal appointive boards, there is nothing contrary to the spirit of our institutions or inimical to our free government in such an enactment.

The judgment of the trial court is correct, and it is *affirmed.*

WEAVER, J. (dissenting).—To my mind the result announced in the majority opinion is not only startling, but is little less than revolutionary. The logical and necessary result of the reasoning there employed and of the conclusion there reached is that, except as to a few offices for which the qualifications are expressly fixed by the Constitution, the Legislature has unlimited power to impose whatsoever condition it pleases upon the right of a person to hold public position or to receive the support of his fellow citizens therefor. If there be a partisan majority in the Legislature, then, under this doctrine, it may make membership in its party an essential condition of the right to hold all county, township, and city offices. It may make the citizen's partisan affiliation a qualification or a bar to his right to serve as a school director or notary public or mayor or justice of the peace. It may even prescribe the shade of political opinion which shall be represented upon the bench. Its power of ostracism need not be confined to the domain of politics. It may invent some "grandfather clause," by which the man who honorably aspires to public office must show his eligibility to membership in the Sons of the Revolution or his right to wear the heraldic emblem of a peer of England. To show that this is a fair, though perhaps an extreme, deduction from

the opinion of the majority, let me call attention to its effect by brief but literal quotations therefrom.·

The majority say:  "There is no such thing as a right to hold office.  This is a privilege at all times within the control of the Legislature save where limited by some constitutional provision.  We shall presently see that there is no such limitation in our fundamental law."  Again it is said:  "Of course, the Constitution guarantees a republican form of government; but there is nothing in the Constitution or in a republican form of government which prevents the Legislature from fixing qualifications for office."  And again:  "It can not be said as a matter of law that any qualification for office fixed by the Legislature is arbitrary or oppressive, or so much so as to be set aside by the courts.".  I have taken these propositions which lie at the very foundation of the majority opinion out of their setting and reproduced them here to concentrate our attention thereon, for I am persuaded that, when carefully read and candidly considered, their essential unsoundness will become evident to the unprejudiced mind.  Opposed to the first of these declarations, I affirm there is "such a thing as the right to hold office" under our form of government, and I deny that the Legislature has unlimited power to restrict that right by affixing qualifications or conditions contrary to the fundamental ideas and purposes of republican government.  No one, of course, may demand an office as his right unless he has been duly elected or otherwise duly chosen thereto; but the right to hold office if elected or appointed, and the right to be chosen to office if his candidacy shall be favorably considered by the people or by the appointing power (if the office be appointive), is inseparable from the idea of a republican form of government.  A government in which, by the law of the land, public officers must be selected from some particular political party, is in no sense republican in form or in fact, and a government which by law proscribes any citizen on

account of his political opinions and makes his adherence to any political party a necessary condition to his right to be considered for an office to which he may aspire is equally unrepublican. This proposition is in no manner avoided or weakened by the conceded authority of the state to provide reasonable conditions as to age, residence, and other qualifications which do not classify the people according to their religious or political views and confer upon one class political rights which are denied to others.

But even this conceded power may be abused in such manner as to trench upon the natural and constitutional rights of the citizen. For instance, suppose our Legislature should by statute provide that to be eligible to any county, township, or city office a citizen must have reached the age of seventy years and must have resided all his life in the precinct in which he is now a voter. Or suppose it be made a necessary qualification for all these offices which most nearly touch the life of the common people that the candidate shall pay taxes on a million dollars worth of property, or shall be able to show a membership card in an accredited labor union, or is in good standing in the Masonic fraternity. Would anybody contend that such regulations are compatible with our form of government? And yet, if the doctrine announced by the majority is to be approved, not one of these conditions is in excess of the constitutional power of the Legislature to impose upon the people. Against such usurpation the power of the people at the polls is unavailing, for a reckless partisan majority once in power may, by imposing extreme conditions upon the right of the people to select their officers and upon the right of the ordinary citizen to aspire to office, erect against the popular voice a barrier which nothing but revolution by violence can remove. The republican government founded by our fathers is the product of revolt against class privilege, and they sought in the national Constitution to hedge against the temptation of any state

to endanger that form of government by reactionary meas-
ures. The framers of our own state Constitution sought
to reaffirm and strengthen that safeguard by declaring that
all political power is inherent in the people, that all laws
shall have uniform application, and that there shall be no
grant of exclusive privileges or immunities to any citizen
or class of citizens. If these constitutional guaranties and
the natural, and necessary inferences to be drawn there-
from, are to be held consistent with statutes such as the
one now under discussion, there is hardly a conceivable
plan of political proscription and class legislation which
can not be justified under the precedent established by the
majority opinion. I must assume that the majority is in-
dulging in judicial pleasantry tinged with sarcasm when
it suggests, in support of such proscriptive legislation, that,
if a "citizen's desire to hold office predominates, then he
may easily qualify himself by voting a party ticket, and if
that be the dominant idea with him he is not deprived of
much when compelled, in order to place himself in line,
to vote a party ticket."

Is aspiration to office inconsistent with the highest
quality of personal character or good citizenship? Hither-
to preferment at the hands of one's fellow citizens has been
supposed to be an honor for which the best may honorably
strive; but such will cease to be the case when we have
firmly established the rule of law that to be eligible to
such service one must "put himself in line" by surrender-
ing his political opinions and voting the ticket of some
party to which a partisan Legislature has granted the ex-
clusive privilege of holding the offices. To say, as does in
effect the majority, that, because the Constitution does
not in so many words prohibit the making of political opin-
ion a legal test of qualification for public office, the Legis-
lature is left without any limitation upon its power in this
respect, is to ignore the entire spirit and purpose of our
governmental charter. While we may not test the consti-

tutionality of an act by our vague and undefined conception of the spirit of the instrument in general, we have the right, in interpreting its express language and in studying the inferences to be drawn therefrom, to bear in mind the general spirit and purpose which inspired its framers, the story of its evolution, and the traditions which cluster about our scheme for the "government of the people, by the people, for the people." Our Constitution does not expressly prohibit the creation in each county of a petty monarchy subject to the suzerainty of a central political boss, or the re-establishment of the feudal system, or the restriction of the right to hold office to naturalized citizens of Irish, German, or Scandinavian birth, yet I think that very few persons will contend that such measures could be constitutionally upheld. Yet such arbitrary distinctions and classifications are innocuous and tolerable compared with distinctions based upon political opinion, and a law which disqualifies a loyal citizen from public preferment because he does not align himself with the majority political party, or the party casting the next highest vote, is as foreign to the spirit of our institutions as would be the creation of a hereditary House of Lords. It is easy for those who happen to be identified with the favored political organizations to look upon such partisan aggressions with tolerance, if not with encouragement; but if the time comes (a by no means impossible supposition) when the Socialist party or Prohibition party, both now under the ban of this legislation, shall come into the control of state or city administration, and, taking up the weapon which the majority of this court has fashioned in the instant case, proceed to intrench itself in power by enacting statutes and ordinances disqualifying all Republicans and Democrats for public office until they are willing to "get into line" with the party in power, it needs no prophet to foretell how quickly the eyes of the submerged opposition will be opened to the outrage perpetrated upon it, or

the promptness with which the unconstitutionality of the
proscription will be demonstrated.

This court has not hesitated to appeal to the spirit
and fundamental ideas of the Constitution even in the
absence of any express provision to meet the case.   In
State v. Van Beek, 87 Iowa, 569, we had to deal with the
eligibility of an unnaturalized person of foreign birth to
the office of sheriff, and, after conceding that there was "no
provision in our Constitution or statute" on that subject,
felt impelled to hold that "it is certainly a fundamental
principle of our government that none but qualified electors
can hold an elective office unless otherwise specially pro-
vided."

In deciding a question submitted to it by the Legis-
lature, the Massachusetts court, though failing to find an
express provision of the Constitution on the subject of
inquiry, disposed of it by resort "to the whole frame and
purport of the instrument itself and the universal under-
standing and unbroken practical construction for the great-
er part of a century."   See 107 Mass. 604.

Dealing with an inquiry into the constitutional power
of the Legislature, Judge Cooley says:

The doctrine that within any general grant of legis-
lative power by the Constitution there can be found au-
thority to take from the people the management of their
local concerns, if practically asserted, would be somewhat
startling to our people, and would be likely to lead here-
after to a more careful scrutiny of charters of government,
lest some time by an inadvertent use of words they might
be found to have conferred upon some agency of their own
the legal authority to take away their liberties altogether.
We have taken great pains to surround the life, liberty, and
property of the individual with guaranties; but we have
not as a general thing guarded local government with sim-
ilar protections.   We must assume either an intention that
the legislative control should be constant and absolute, or,
on the other hand, that there are certain fundamental prin-
ciples in our general framework of government which are

within their contemplation when they agree upon the written charter subject to which the delegations of authority to the several departments of government have been made. That this last is the case appears to me too plain for serious controversy. The implied restrictions upon the power of the Legislature as regards local government, though the limits may not be so plainly defined as express provisions might have made them, are nevertheless equally imperative in character, and, whenever we find ourselves within them, we have no alternative but to bow to their authority. The Constitution has been framed with these restrictions in view, and we should fall into the grossest absurdities if we undertook to construe the instrument on a critical examination of the terms employed while shutting our eyes to all other considerations. . . . Constitutional freedom certainly does not consist in exemption from governmental interference in private affairs of the citizen; in his being unmolested in his family; suffered to buy, sell, and enjoy property, and generally to seek happiness in his own way. All this might be permitted by the most arbitrary ruler, even though he allowed his subjects no degree of political liberty. The government of an oligarchy may be as just, as regardful of private rights, and as little burdensome as any other; but, if it were sought to establish such a government over our cities by law, it would hardly do to call upon a protesting people to show where in the Constitution the power to establish it was prohibited. It would be necessary, on the other hand, to point out to them where and by what unguarded words the power had been conferred. Some things are too plain to be written. *People v. Hurlbut,* 24 Mich. 44 (9 Am. Rep. 103).

Citing the authority of Justice Story, Judge Cooley further adds: "Constitutional freedom means something more than liberty permitted. It consists in civil and political rights which are guaranteed, assured, and guarded; in one's liberties as a man and a citizen; his right to vote, his right to hold office, his right to worship God according to the dictates of his own conscience; his equality with all others who are his fellow citizens; all these guarded and

protected and not held at the mercy and discretion of any one man or of any popular majority."

Speaking of the restraints upon legislative power, Justice O'Brien, a distinguished New York jurist, says: "Such restraints may be found either in the language employed or in the evident purpose which was in view and the circumstances and historical events which led to the enactment of the particular provision as a part of the organic law. A written Constitution must be interpreted as the paramount law of the land according to its spirit and the intent of the framers as indicated by its terms. In this sense it is just as obligatory upon the Legislature as upon other departments of the government or upon individual citizens." *Rathbone v. Wirth,* 150 N. Y. 459 (45 N. E. 15, 34 L. R. A. 408).

Says the same court, in *People v. Albertson,* 55 N. Y. 55:

An act violating the true intent and meaning of the Constitution, although not within the letter, is as much within the purview and effect of a prohibition as if within the strict letter, and an act in evasion of the terms of the Constitution as properly interpreted and understood and frustrating its general and clearly expressed or necessarily implied purpose is as clearly void as if in express terms forbidden. A thing within the intent of the Constitution is for all purposes to be regarded as within the words and terms of the law. A written Constitution would be of little avail as a practical and useful restraint upon the different departments of government if a literal reading only were to be given to it to the exclusion of all necessary implication, and the clear intent ignored, and slight evasions or acts palpably in violation of its spirit should be sustained as not repugnant to it.

The Legislature is not the state, nor the people, nor is it their authorized representative clothed with sovereign power, except as that function has been bestowed by the people in the charter, or "letter of authority," which we

call the Constitution. Equally with the executive and judicial departments of government must the legislative find its authority and jurisdiction to act in that instrument. It follows therefore that in determining the validity of a statute the courts are not always required to find in the Constitution some specific inhibition which has been disregarded or some express command which has been disobeyed. "Prohibitions are only important where they are in the nature of exceptions to a general grant of power, and, if the authority to do an act has not been granted by the sovereign to its representative, it can not be necessary to prohibit its being done." Cooley's Const. Law (5th Ed.) 203.

Judge Herrick, in *Rathbone v. Wirth,* 6 App. Div. 277 (40 N. Y. Supp. 535), states the rule as follows: "In interpreting the power of the Legislature under the Constitution, we are not confined to the strict letter of that instrument, or compelled to point out the exact article, clause, or phrase therein which grants or denies the power in question. There are some things so contrary to the purpose and spirit of the Constitution that they must be said to be in conflict with it, although it can not be contrasted with any specific portion of it. The object of its adoption and its purpose and intent, taken as a whole, must be considered." Nor is this, when properly understood, inconsistent with the general rule that, except as restrained by the Constitution, the Legislature has plenary power to legislate upon all matters affecting public interests. *State v. Moores,* 55 Neb. 480 (76 N. W. 175, 41 L. R. A. 624).

The Constitution is not the source or the foundation from which the rights of the people are derived. Popular rights are older than written Constitutions, and the purpose of the latter is to preserve, and not to destroy, them. The framers of our present State Constitution served a people already organized into a popular form of government in which freedom of speech, thought, and opinion was univer-

sally accepted as a fundamental right, and the omission to provide, in express words, that no man shall be made ineligible to public office because of his political opinions, can well be accounted for on the ground that such prohibition inheres in the very nature and form of our government, and is fairly implied in the language of the instrument as written. Possibly they acted on the theory, already quoted from Judge Cooley, that "there are some things too plain to be written"—a saying which that distinguished author might have withheld had he lived to read the law to which this court now gives utterance. Not long since, when our Legislature enacted a statute relieving the veterans of the late war from the burden of paying license for the privilege of doing business as peddlers, this court held it unconstitutional, saying: "Equality in right, privilege, burdens, and protection is the thought running through the Constitution and laws of the state, and an act intentionally and necessarily creating inequality therein, based on no reason suggested by necessity or difference in condition or circumstances, is opposed to the spirit of free government and prohibited by the Constitution." *State v. Garbroski,* 111 Iowa, 500. True the case here cited involved a question of business privilege, and not of political privilege; but I have yet to find that the constitutional inhibition against special privileges and immunities may be involved only when the question is one of dollars and cents and remains voiceless and helpless against political discriminations involving rights and privileges of more than money value.

Thus far the authorities I have cited go principally to the right and necessity of interpreting constitutional guaranties with due reference to the purposes for which our republican government was organized, and in accord with the spirit and intent which pervades and inspires that instrument as a whole. I now wish to demonstrate that the position I have taken has the support of

high authority, and that eligibility to office can not be constitutionally limited to a political faction. Turning to *Barker v. People,* 3 Cow. (N. Y.) 686 (15 Am. Dec. 322), we find the subject very clearly discussed and the law stated as follows:

The Constitution giving the right of election and the right of appointment, these consisting essentially in the freedom of choice, and the Constitution also declaring that certain persons are not eligible to office, it follows from these powers and provisions that all other persons are eligible. Eligibility to office is not declared as a right or principle by any express terms of the Constitution, but it results as a just deduction from the express powers and provisions of the system. The basis of the principle is the absolute liberty of the electors and the appointing authorities to choose and appoint any person who is not made ineligible by the Constitution. Eligibility to office therefore belongs not exclusively or especially to electors enjoying the right of suffrage. It belongs equally to all persons whomsoever not excluded by the Constitution. I therefore conceive it to be entirely clear that the Legislature can not establish arbitrary exclusion from office or any general regulation requiring qualifications which the Constitution has not required.

The question we are considering was before the Alabama court in *Dorsey's* case, 7 Port. 293, where it was held that, under the declaration in the Bill of Rights entitling each citizen to all the rights and privileges given to any other citizen, it was not competent for the Legislature to limit or destroy a citizen's right to aspire to public office.

In the Michigan case (*People v. Hurlbut, supra*) the statute being considered contained a provision requiring the selections to certain offices to be confined to members of two political parties. The court says of this provision that it is "simply nugatory, because the Legislature on general principles have no power to make party affiliation a qualification for office."

Again, in *Attorney-General v. Board,* 58 Mich. 213 (24 N. W. 887, 55 Am. Rep. 675), a similar statute was once more considered and once more condemned. In its discussion of the case the court remarks: "Parties, however powerful and unavoidable, and however inseparable from popular government, are not and can not be recognized as having any legal authority as such. The law can not regulate or fix their numbers, or compel or encourage adhesion to them. Many good citizens form no permanent party ties, and when elections are close the effort of each party is to detach votes from the friends of the other. Where there are two parties larger than any other, the success of either is very often gained by coalition with a third one. Party allegiance is not uncommonly laid aside for the time being, so that it can not be said that any party is represented in the election. However well meant such a statute may be, it distinctly makes party adhesion a condition of office, and not only so, but it puts all but two favored parties beyond the possibility of representation if the law is obeyed." In the same case, Morse, J., forcibly says that such discrimination is in plain violation of the spirit of our Constitution and has a tendency to hamper and abridge the rights of those belonging to parties thus deprived of representation in office. "There can be in a truly republican government no political or religious test in holding office; the political and religious liberty of the citizen being the foundation of republican institutions. If this law had provided in express terms that these various boards should be equally divided between Republicans and Democrats, its repugnance to the Constitution would be plainly apparent to all. As it is, it accomplishes by indirect language the same result." Again, the same writer says:

It is urged that the political proscription in this law is less than actually takes place without it; that those having the appointing power under the old law do in fact

appoint all these officers from one party, instead of two, thus precluding still more citizens from these places. In answer it can be said that this was an abuse of power not sanctioned by the law, but permitted, if at all, by its silence, while the act before us puts the seal and stamp of approval upon the very abuse it seeks to cure, and makes it a requisite for these officers to be partisans of a certain name or designation, thus making this evil of partisan appointment a permanent feature of our state policy. For if the Legislature has the power to require that these offices shall be filled by members of two parties only, it is competent to pass a law that they shall be holden only by the members of the leading party, and a partisan majority in the Legislature may fix the political belief of every municipal officer in the state, taking from the people of the locality the right to have a (local) government of a different political color than the Legislature. The remedy is worse than the disease. It is not only political oppression, but a deprivation of local self-government. . . . The argument might be elaborated further, but it is useless. In any way we turn this law and apply it to the common everyday occurrences in political life and action at our elections, the more clearly does it appear that this act can have no other effect than the disfranchisement of a large body of the people from holding these offices simply because for the time being they are politically in the minority in the city. And it should be remembered that all are liable to bear its ostracism. The changes and fluctuations in votes constantly going on often place the majority at one election in the minority at the next, and they who wield the club of power under this law today may themselves feel its weight tomorrow.

In the heat of partisan excess and bitterness which marked the days immediately preceding the Civil War, the Legislature of Maryland, in enacting a law for a board of police commissioners for the city of Baltimore, inserted therein a condition that "no black Republican or indorser or approver of the Helper book" should be appointed to such office. The Supreme Court of that state, in passing upon the act, conceded that, if by this provision it was

"intended to proscribe a class of persons on account of their political or religious opinions," it was void; but that grave and reverend tribunal found itself unable to pass upon the question, because they could not "officially understand who were meant to be affected by the proviso, and therefore could not express a judicial opinion on this question." In other words, as lawyers and men of intelligence, the court could not stultify itself by upholding a scheme to proscribe citizens on account of their political opinions, yet, lacking the courage to resist the torrent of political passion then sweeping over the land, they sought refuge in a plea of judicial ignorance as to the meaning of words which were then in constant everyday use in every nook and corner of the land, and concerning the signification of which no person in the United States of ordinary mental capacity and intelligence could have the slightest doubt.

The Legislature of the state of Indiana enacted a statute by which eligibility to a city board of police and fire department commissioners was confined to persons representing two political parties and having resided in the city five years. This act was held to be a violation of the constitutional prohibition of special privileges and immunities. The court there says: "The act classifies the citizens of Indianapolis and Evansville as to eligibility for commissioners of the Metropolitan Board: (1) Those who have resided in the cities five years, and (2) those who have not. Those of the first class are eligible to be elected commissioners, and those who belong to the second class are ineligible. To the first class privileges and immunities are granted which upon the same terms do not equally belong to the second class. It is no answer to say that, when those who belong to the second or disqualified class have resided in the city for the required length of time, the disqualification is removed, and they become eligible for the reason that five years' residence transfers them to the eligible class. The act also classifies the citi-

zens of the cities to which it applies as to the positions and employments on the police force and in the fire department by requiring that all officers and employees be selected from the two leading political parties found in those cities. It is well known that members of probably a half dozen political parties reside in these cities, and that a large number of citizens who belong to no particular party reside therein. All of these persons are disqualified for positions and employments in either of the departments named. If it is competent for the Legislature to require, as a test for position and employment under the provisions of this act, membership in a political party or organization, it is difficult to understand why a religious or other test may not be made. We are of the opinion that, insofar as the act creates a residence qualification and provides a political test, it contravenes the Constitution. It is not only in violation of the spirit, but of the letter, of section 23, art. 1, Const. Ind. (against special privileges and immunities). Upon a question so clear it would hardly seem necessary to cite authorities, but see Cooley's Const. Law, 483; *Brown v. Haywood,* 4 Heisk. [Tenn.] 357; *Louthan v. Com.,* 79 Va. 196 [52 Am. Rep. 626]; *Attorney-General v. Detroit,* 58 Mich. 213 [24 N. W. 887, 55 Am. Rep. 675]." In further discussion of the case, the court say: "The statute in question is very remarkable to say the least of it, and if it became necessary it would be a question for serious consideration whether it ought not to be held unconstitutional upon the ground that it is contrary to natural justice and equity. *Pumpelly v. Oswego,* 45 How. Prac. [N. Y.] 219; *Bradshaw v. Rodgers,* 20 Johns. [N. Y.] 103."

In *Bowden v. Bedell,* 68 N. J. Law, 451 (53 Atl. 198), the New Jersey court had to deal with a statute creating a board of five excise commissioners, but provided that in elections to such board no voter should be allowed to vote for more than three, and that not more than three

of such members should belong to the same political party. Upon authority of a previous decision by that court. *Mc-Ardle v. Jersey City,* 66 N. J. Law, 590 (49 Atl. 1013, 88 Am. St. Rep. 496), the restriction upon the right of the voters imposed by this statute was held unconstitutional; and with special reference to the political test so provided the opinion speaks as follows: "It is contended, however, that the court can eliminate this unconstitutional feature and allow the rest to stand. The clause in the act that 'no more than three members shall belong to the same political party' is open to grave doubts as to its constitutionality. It is doubtful whether eligibility to office in this state can be restricted by any qualification other than that required for the right of suffrage except where such restriction is found in, or its imposition is authorized by, the Constitution of the state. It is not clear that the holding of any political opinion or belief is a disqualification for office under a republican form of government. It is not discernible how republican government could be continued with such power of restriction upon eligibility to hold public office."

In *Louthan v. Commonwealth,* 79 Va. 196, (52 Am. Rep. 626), the Virginia court held unconstitutional an act forbidding certain school and judicial officers to engage in political activities, saying: "If our government is a government by the people, to seek active participation in the government is the plain privilege of every citizen."

Speaking of the limitations upon the power of the Legislature to impose qualifications for office, the Massachusetts court has said: "The Legislature, in establishing offices not provided for by the Constitution, has often required that the persons or some of the persons to be appointed shall possess certain qualifications, or that some shall be women and some men; but in all cases, so far as we are aware, the qualifications required bear such relation to the duties imposed that they tend to secure that kind

and degree of knowledge, experience, and impartiality which are requisite for the satisfactory performance of the duties, and it is open to any person to acquire the qualifications required." *Brown v. Russell,* 166 Mass. 14 (43 N. E. 1005, 32 L. R. A. 253, 55 Am. St. Rep. 357).

It is unnecessary to prolong this citation of authorities, already of tedious length. I desire to say, however, that the conclusion for which I contend is not inconsistent with the decision announced by us upon the soldiers' preference act. While dissenting therefrom upon principle, I concede its authority as a precedent; but that statute in no manner trenches upon the right or privilege of the citizen to hold what political opinion he pleases without being made thereby ineligible to office. Had that act gone further along the line of the statute now before us, and classified the veterans according to their political opinions, and provided that only those of Republican or Democratic affiliation should be entitled to its benefits, I am sure that the result in that case would have been very different. Nor do the cases cited in the majority opinion bear out the conclusion there reached. The principal case, *Rogers v. Council,* 123 N. Y. 173 (25 N. E. 274, 9 L. R. A. 579), construes a very different statute from the one before us. There the provision was that of the members of a certain board not more than two should be of the same political party. The appointing power was not confined in its selection to any one or two parties, but could make its selection from the entire citizenship, being limited only as to the number to be selected from any one party. Thus every citizen was eligible to be considered in connection with the position. The court there itself drew the distinction between that case and those from Michigan, Indiana, and other states which I have cited. Most of the other decisions cited by the majority fall within the same class as the *Rogers* case. In *State v. Bemis,* 45 Neb. 724 (64 N. W. 348), the Nebraska court contented itself with the sug-

gestion that, if such statute could not be made mandatory, it might be treated as at least advisory. In *Patterson v. Barlow,* 60 Pa. 54, the subject is disposed of in a perfunctory way without discussion of the principles involved, and in *Commonwealth v. Plaisted,* 148 Mass. 375 (19 N. E. 224, 2 L. R. A. 142, 12 Am. St. Rep. 566), the controversy involved the constitutional right of the Salvation Army to parade the streets of Boston with music and banners in violation of a city ordinance, and the clause at the end of the opinion seeming to bear upon the question in the instant case has no apparent relevance to the issues there being considered and may be passed as mere dictum.

In none of these cases has the constitutional objection based on the prohibition of special privileges and the fundamental principles of republican government been considered or held inapplicable. Nor are any of the decisions cited by me to be disregarded because of the peculiar provisions of the Constitutions of the states whose statutes have been held invalid, for in each instance, while these peculiar provisions have been cited, the court has discussed and disposed of the questions on general principles of constitutional power and fundamental rights which are common to all states. Approve the classification of the people by law according to party lines, and the exclusion of some as against the others from the right to be considered for public position, and we open a gate to the gravest abuses. The power to thus classify without restraint is the power to utterly destroy republican institutions. If we may classify by parties, we may classify according to financial and social position. If we may exclude from the right to hold these offices the members of three out of five political parties, we may exclude the fourth, and, when this is accomplished, proceed to a process of exclusion against the recalcitrant elements of the fifth until none are left save the select few who bear the hall-mark of regularity attested by some party potentate,

Possibly the statute now before us is in itself a thing of small importance, and that its direct evil effects, if any, will be felt by very few persons; but an aggression upon fundamental rights can not be so small that, if given the stamp of legitimacy by the courts, it will not be a dangerous precedent. It may be, as is often boasted, that our Republic is invulnerable to assault by alien enemies; but that nation was never founded and that government never devised which could look with indifference upon the subversion of popular rights for partisan ends and live. As it has always been in this respect, it must ever be. The principles which control it inhere in the very nature of the race of mankind and of all organized society. We have the word of a great statesman that "Eternal vigilance is the price of liberty," and eternal vigilance to guard against relapse from republican principles by the makers and expounders of the law is no less essential to the perpetuation of free government. A republican government which sacredly observes and upholds the rights of the poor no less than the rich, the weak no less than the powerful, the minority no less than the majority, deserves and will command the love of its subjects and the admiration of mankind; but the government which, masquerading under the name "republican," denies equality of opportunity to its citizens or proscribes them for their political opinions, is a sham and a fraud.

Were it not for the gravity of the issues involved in this decision and the far-reaching consequences which must logically follow from the precedent established by the majority opinion, I should not be justified in this extended expression of dissent; but believing, as I do, that this case signalizes a regretable breach of constitutional guaranties which lie at the very foundation of republican government, my only apology is for my inability to protest in more effective terms.

The judgment appealed from ought to be *reversed*.

EVANS J. (dissenting).—I agree in the main with the argument of the dissenting opinion by Justice Weaver, but with the following qualification: I think that the unconstitutional provision in section 679d is all contained in one sentence, i. e., "the said commissioners shall be selected from the two leading political parties," etc. I see no reason why this unconstitutional proviso may not be eliminated and disregarded without destroying the integrity of the remainder of the act. In this particular case, it is true, the defendant has made his appointments in purported obedience to this part of the statute, and the appointment should be held invalid on that account. I agree therefore that the case should be reversed on that ground. I think, however, that the form of the adjudication should go no further than to hold this particular proviso invalid as being unconstitutional, and that it should not in any manner restrain the defendant mayor from exercising his power of appointment hereafter in accordance with the valid provisions of the act in question.