# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

## LOUTHAN v. THE COMMONWEALTH.

### July 24, 1884.

1. PUBLIC PRIVILEGES AND FREEDOM OF SPEECH.—Constitution of Virginia, Art. I, sections 14 and 20, and Art. V, section 14, wherein it is said: "Any citizen may speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty," and, "All citizens of the state are hereby declared to possess equal civil and political rights and public privileges;" and, "The general assembly shall not pass any law abridging the freedom of speech or of the press;" applies to and protects the rights of *all* citizens of the commonwealth, whether occupying a private or an official station.

2. CONSTITUTIONAL LAW.—The act of the legislature approved 18th March, 1884 (Acts 1883-4, p. 698), entitled "An act to prohibit the active participation in politics of certain officers of the state government," is inconsistent with the constitution of Virginia, and is therefore null and void.

3. EX PARTE CURTIS, 106 U. S. Reports, 371, reviewed.

Error to judgment of hustings court of city of Richmond, rendered 7th May, 1884, against Carter M. Louthan on an indictment for a misdemeanor, whereby he was sentenced to pay a fine of $50 to the commonwealth, and the costs of the prosecution, and to be removed from his office of superintendent of schools for Clarke county. .

The indictment was based on an alleged violation of the act of the general assembly which was approved 18th March, 1884, entitled "an act to prohibit the active participation in politics of certain officers of the state government." (Acts 1883-4, p. 698.)

The first and second sections of said act are as follows:

§ 1. "It shall not be lawful for the judge of any court, the superintendent of public instruction, any superintendent of schools, the superintendent, manager or any employee of any asylum, or state institution of learning, actively to induce or procure, either directly or indirectly, or to attempt either directly or indirectly to induce or procure any qualified elector to vote in any election for any particular candidate, or in favor of any particular political party, or to vote against any particular candidate, or against any particular party.

§ 2. "It shall not be lawful for any of the officers or employees mentioned in the foregoing section to participate actively in politics, and making political speeches, or the active or official participation in political meetings, shall be deemed to be an active participation in politics within the meaning of this section."

Any violation of this act is declared a misdemeanor, and is punishable by fine and forfeiture of office.

The indictment is as follows:

"The grand jurors of the commonwealth, for the body of the city of Richmond, on their oaths present, that Carter M. Louthan, on the 23d day of April, in the year one thousand eight hundred and eighty-four, at the said city, and within the jurisdiction of the said hustings court of the city of Richmond, being then and there a superintendent of public schools for the county of Clarke, unlawfully did participate in a certain political meeting, or convention, which assembled at the said city of Richmond on the 23d day of April, in the year 1884, and did then and there advocate the ticket of electors proposed by said convention for president and vice-president of the United States, to be voted for at an election to be held in November next, against the peace and dignity of the commonwealth of Virginia."

To this indictment the defendant appeared and filed a demurrer, which was overruled. He then plead not guilty. Thereupon he was tried by a jury, who returned their verdict in these words: "We, the jury, find the defendant guilty, and as-

sess his fine at fifty dollars." The defendant moved the court to set aside the verdict as being contrary to the law and the evidence, and to grant him a new trial, which motion the court overruled, and entered judgment as follows:

" Whereupon it is considered by the court that the said Carter M. Louthan pay and satisfy the said fine of fifty dollars, and the costs of this prosecution, and in default of the payment thereof, that he be confined in the jail of this city until the same be paid, or he be otherwise discharged by due course of law, such confinement not to exceed six months. And it is further ordered that the office of superintendent of public schools for the county of Clarke, held by the said Carter M. Louthan, be and the same is hereby declared vacated.

"And a *capias pro fine* is awarded against the said Carter M. Louthan."

To this judgment Louthan obtained a writ of error and *supersedeas* from one of the judges of this court.

*R. T. Hubard, A. A. McDonald,* for plaintiff in error.

*Attorney-General F. S. Blair,* for the commonwealth.

LACY, J., delivered the opinion of the court :

It is not necessary to notice the various defences set up to the prosecution. The main defence relied on, by the plaintiff in error, if not the only one, is that this act of the legislature is in violation of the constitution of the United States and of the state of Virginia. If the act of the legislature set forth above, is in violation of either the constitution of the United States or of the constitution of the state of Virginia, then the constitution infringed shall rather prevail than the act of the legislature which infringes it. The superior law must prevail, and the inferior law must give way before the superior law. And when a court is called upon to enforce the inferior law, or the

superior law with which it is in conflict, if they are so opposed that both canno⸱ be enforced, but if one is enforced then the other is invalidated, the inferior law must be disregarded and the superior law must be enforced. Being in conflict both cannot be enforced, and the superior law must govern, the inferior law to the contrary notwithstanding. The court cannot refuse obedience to the mandates of the constitution. The legislature is called into existence by the constitution, and its powers are restrained and limited by the constitution. The legislature cannot alter, amend, or modify the constitution. The constitution in all its provisions, is beyond the reach of any legislative enactment, however seemingly wise and beneficent its provisions. It is always with reluctance, and never in a doubtful case, that the court will set aside and decline to enforce an act of the legislature. As has been often remarked in this court, the legislature is endowed by the constitution with the legislative power of this commonwealth. It does not possess only granted, but supreme power in the exercise of legislative powers limited and restrained only by the express terms of the constitution, or the necessary implications therefrom. It will be admitted that the acts complained of in this indictment, are not in themselves wrong. If our government is a government by the people, to seek active participation in the government, is the plain privilege of every citizen. It is not only the privilege, but it might reasonably be held to be the plain duty of all the people; and this will not be denied as an original proposition, true in itself.

But that this principle is recognized in the charter of our liberties, in the constituion of the United States and in the constitution of Virginia, is equally clear. Under the constitution of the United States, congress is forbidden to pass any law respecting an establishment of religion, or prohibiting the full exercise thereof, or abridging the freedom of speech, or of the press, or *the right of the people peaceably to assemble* and petition the government for a redress of grievances.

Under the constitution of Virginia the legislature is forbidden

in express terms from putting any restraint upon the freedom of the press, or the freedom of the citizens to freely speak, write and publish his sentiments on all subjects, for that instrument declares: "That the freedom of the press is one of the great bulwarks of liberty and can never be restrained but by despotic governments, and any citizen may speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty." Art. I, § 14, const. of Va.

And again: "All citizens of the state are hereby declared to possess equal civil and political rights and public privileges." Art. I, § 20, const. of Va.

And again, when prescribing the powers and duties of the legislature, the constitution *in terms forbids* the legislature from abridging the freedom of speech, declaring: " *The general assembly shall not pass any law abridging the freedom of speech or of the press."* Art. 5, § 14, const. of Va. Thus we find freedom of speech and protection to the equal political rights of *all* the people deeply imbedded in the fundamental principles of our government.

And not content with the most solemn declaration of principles, an impregnable barrier is erected before them in this last quoted unmistakable limitation upon the legislative power; and the legislature is deprived of the power to abridge the freedom of speech of any citizen; it takes its existence and its powers, absolutely deprived of this power. And then the constitution covers this inalienable right of the citizen with a shield which confronts every legislature which can ever have any existence under the constitution, with an oath of office which records its fealty to the constitution before it can either enact laws or have any existence. And in every department of the government this safeguard is not forgotten, but is kept steadily in view to maintain all its provisions sacred as the years pass. We have ventured to say that none will be found in the limits of this commonwealth to deny to the citizen these inalienable rights.

It is admitted also that Carter M. Louthan is a citizen of Vir-

ginia, and that he has never in any wise abused this inestimable privilege guaranteed to all her citizens by the state in her organic law. It is admitted that the said plaintiff in error has committed no excess in the exercise of his rights of citizenship, it is only alleged that he did *peaceably assemble* together with his fellow-citizens, and did advocate a certain set of electors for president and vice-president of the United States at the coming election in November next. For this he has been indicted by a grand jury in the city of Richmond, tried for it and convicted, and sentenced to be punished. Now why may not Carter M. Louthan do these acts, in themselves so harmless, and under the supreme law of this land so entirely lawful? We have already seen the act in question which has declared the exercise of these constitutional rights a crime. What is it that makes the exercise of these rights of the citizen by this citizen a crime? Because he has been appointed to and holds the office of county superintendent of schools in the county of Clarke. It is contended by the commonwealth that because he is the incumbent of this office, the legislature, in the exercise of its general powers, may impose upon him such conditions, such restrictions as to it may seem for the public good. The learned attorney general has presented before this court the case on the side of the prosecution; and he contends first, that the plaintiff in error being an officer appointed by the state board of education, does not come within the provisions of the constitution already recited; in other words, that being an officer, he is not a citizen within the contemplation of the constitution; that the legislature has the right to exclude the officers of the state government from incompatible pursuits; that the legislature felt that the active participation in politics by school officials was an evil that should be restrained; and contends that the legislature has the power to make all needful laws and regulations to carry into effect the public free school system provided for by the constitution; citing the case of *ex parte* Curtis, 106 U. S. Reports (16 Otto), 371.

Vol. LXXIX—26.

In that case the supreme court of the United States, in construing the act of congress prohibiting the employees of the government, under penalty, from giving or receiving moneys for political purposes, held that act not to be unconstitutional. The act of congress under consideration in that case, provides "that all executive officers or employees of the United States, not appointed by the president with the advice and consent of the senate, are prohibited from requesting, giving to, or receiving from any other officer or employee of the government any money or property, or other thing of value, for political purposes, and any such officer or employee who shall offend against the provisions of this section shall be at once discharged from the service of the United States, and he shall also be deemed guilty of a misdemeanor, and, on conviction thereof, shall be fined in a sum not exceeding five hundred dollars." Mr. Chief-Justice Waite, delivering the opinion of a majority of the court, said : " The act is not one to prohibit all contributions of money or property by the designated officers and employees of the United States for political purposes, neither does it prohibit them altogether from receiving or soliciting money or property for such purposes. It simply forbids their receiving from or giving to each other. *Beyond this no restrictions are placed on any of their political privileges.*" That the evident purpose of congress in such enactments was to promote efficiency and integrity in the discharge of official duties, and to maintain proper discipline in the public service ; that those in office can contribute as liberally as they please, provided their payments are not made to any of the prohibited officers or employees.

That being so, that is the political privileges of these officers and employees being unimpaired, the court held the act in question constitutional. It is clear from the opinion of the court in this case, that if the act in question had debarred the persons included therein from any political privilege, that the court would have regarded it as a different question altogether. But the chief-justice does not leave this matter to conjecture, but proceeds

to show, in a strong light, that the act in question was, in effect, an act to preserve and to protect the political privileges of the persons included in its provisions; that the effect of the act was to prevent oppression and to leave the employees of the government free to contribute or not to contribute, according to their own uncontrolled desire, to any political party, or to no political party, as a free inclination might suggest or dictate; and to protect such persons from being compelled to contribute their money in a manner contrary to their own wishes and sympathy.

He says: "A feeling of independence under the law, conduces to faithful public service, and nothing tends more to take away this feeling than a dread of dismissal. If contributions from those in public employment may be solicited by others in official authority, it is easy to see that what begins as a request may end as a demand, and that a failure to meet the demand may be treated by those having the power of removal as a breach of some supposed duty growing out of the political relations of the parties. Contributions secured under such circumstances will quite as likely be made to avoid the consequences of the personal displeasure of a superior, *as to promote the political views of the contributor—to avoid a discharge from service, not to exercise a political privilege.* The law contemplates *no restrictions* upon either giving or receiving, EXCEPT SO FAR AS MAY BE NECESSARY TO PROTECT IN SOME DEGREE THOSE IN THE PUBLIC SERVICE AGAINST EXACTIONS THROUGH FEAR OF PERSONAL LOSS;" referring to the act of February 1st, 1870, chapter 63, Rev. Stat. 1784, "To protect officials in public employ."

The court says further: "*No one can, for a moment, doubt* that in both these statutes the object was to protect the classes of officials and employees provided for from being compelled to make contributions for such purposes through fear of dismissal, if they refused." And that, "political parties must almost necessarily exist under a republican form of government, and when public employment depends to any considerable extent on party success, those in office will naturally be desirous of keeping the

party to which they belong in power.    The statute we are now considering does not interfere with this.''

This is the case of *ex parte Curtis*, and we have thus fully recited and considered it, because it is appealed to by the learned attorney-general to uphold the act of the legislature in this case, which, as we have seen, forbids certain citizens and officers of the state government from taking part in political meetings and speaking their sentiments on political questions freely according to their own untrammeled desire.

The supreme court of the United States declared the act of congress constitutional because it did not destroy but protected the political privileges of these employees of the government, and guaranteed to them the right as freely as all others in the country, to act on political questions according to their own desire, and support without control, and without let or hindrance, the political party which they preferred.

We cannot read that case and regard it as giving countenance to congress, or to any other legislative body, to seal the lips of citizens, and exclude them from the assemblies of the people, unless they will sit dumb among their fellow men, and to forbid their holding communion with their fellow-citizens on governmental questions, to directly or indirectly influence the votes of others.

We think we can justly and fairly appeal to that decision of our supreme judicial tribunal as sustaining the view we have taken of this case.

There may have been a time in the history of our country when the nature of the government was less understood and less clearly defined, when this might have been an open and debatable question; but we cannot now so regard it.

In the early days of the republic, ambitious and despotic rulers, seeking to perpetuate their power, or to aggrandise their stations, and finding no express prohibition in the organic law, passed laws placing restraints upon the political privileges of the people; and in 1798 passed the sedition act, which trammeled

freedom of speech, and imposed penalties upon the free discussion of political questions. This brought on a conflict between the people and their rulers, which culminated in a change of rulers, and in the constitutional provisions, both federal and state, which we have recited above, which guaranteed to the citizens of the United States and of the state of Virginia freedom of speech, and the right to peacefully assemble, to freely speak and freely write their sentiments on all subjects.

Virginia, ninety-six years ago, standing upon the threshold of the new Union, pausing before she joined hands with her sister states, and pledged her faith to form a more perfect union, declared "that among other essential rights the liberty of conscience and of the press cannot be cancelled, abridged, restrained or modified by any authority of the United States."

And immediately upon the formation of the Union by the ratification of the constitution, we find congress proposing, and the states ratifying among others, the first amendment to the federal constitution embodying this declaration, which was thus set in its place in the national household, where in the future, as in the past, through all coming time, let us hope it may remain sacred in the eyes of the nation.

Virginia, as we have seen, has deeply written this principle upon her own constitutional tables of stone, and it cannot be violated by any department of her government. But it is contended that this act does not affect the citizens of Virginia, it only affects certain officeholders, and the legislature has the right to regulate the conduct of these. These officeholders could not be such if they were not citizens. The citizens of Virginia fill her offices. And as we have no privileged classes in this state, so we have no class of citizens outside of the protection of the constitution. That the legislature may correct abuses in official conduct; that official malfeasance or misfeasance is liable to punishment none will deny ; but there is no pretence of such in this case. The act is not entitled an act to correct official misconduct or the abuse of official station, but is

entitled " An act to prohibit the active participation in politics of certain officers of the state government."

If the legislature has the power to forbid the exercise of one political privilege, why may it not forbid the exercise of another? If it may forbid one of the officers of the government to speak or write according to his sentiments on public affairs, why may it not forbid the officer from voting according to his sentiments, and why may it not impose other restrictions and other disqualifications, until the officer is driven from his office because of the exercise of his constitutional privileges? The officer in question is a constitutional officer, and while he may be removed from office for malfeasance, misfeasance, or gross neglect of official duty, or for sufficient cause, he cannot be removed for exercising any right guaranteed to him by the constitution without violating that instrument. The constitution provides the method of his removal, and the legislature cannot remove him in a different method, by creating a new offence and submitting the question of his removal to any other tribunal than that provided by the constitution, the senate of the state. Far less can the legislature, in the exercise of its general powers, declare that to be a crime, which the constitution has declared to be an inalienable right.

It is contended that the legislature has this right, as we have said, because this citizen is an officer of the government; that the constitutional provision applies to the citizens other than officers of the government. We do not so read the constitution. These rights are guaranteed to all the citizens of the state, not to any portion or any class of citizens. And because a deserving man has been honored with the confidence of his fellow-men and elevated to a position of honor and trust, is no just cause for his political degradation, but the contrary.

We are of opinion that the act of the legislature in question is in violation of the constitution of Virginia, is, therefore, null and void, and that the supposed offence for which Carter M. Louthan was indicted and tried, is not a crime under our laws;

and that the judgment complained of and appealed from, must be reversed and annulled, and the prosecution against him dismissed.

LEWIS, P., dissenting, said:

I think the indictment is plainly defective in form, and that on that ground the defendant's demurrer ought to have been sustained by the hustings court. For this reason I concur in reversing the judgment, but I dissent from the opinion of the court, in so far as it holds the act in question unconstitutional. In doing so, I express no opinion as to the constitutionality of the first section of the act. The indictment manifestly was intended to be drawn under the second section, and to that and subsequent sections I shall confine what I have to say.

The object of the act, as expressed in its title, is " to prohibit the active participation in politics of certain officers of the state government." It was duly approved by the governor, and has thus received the sanction of both the legislative and executive branches of the government. The second section declares it unlawful for any of the officers or employees mentioned in the first section to participate actively in politics, and further declares that making political speeches, or the active or official participation in political meetings, shall be deemed to be an active participation in politics within the meaning of that section. It is further enacted that any person violating the provisions of the act, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished in the manner prescribed by the act.

It certainly requires no argument to show, and I shall not, therefore, undertake to argue, that if the legislature may by law prohibit officers and employees of the state government from actively participating in politics, it may prescribe penalties for a violation of the law in addition to the forfeiture of the offender's office or employment. To my mind, the only question is whether

it is competent for the legislature to pass the act at all. And in determining that question we look to the constitution, not to ascertain what are the powers of the legislature, but what restrictions upon its powers are there imposed. Plenary power in the legislature for all purposes of civil government is the rule, a prohibition to exercise a particular power is an exception; and it is for those who question the validity of a statute to show that it is forbidden. An act of the legislature is, therefore, presumed to be constitutional, and in no case ought it to be declared invalid, unless its invalidity is established beyond a reasonable doubt. This, I think, has not been done in the present case; and in view of the importance of the case, I will briefly state the reasons for this conclusion.

To my mind it is a self-evident proposition that the legislature may establish reasonable regulations for the conduct of those in the service of the state, and may by law prohibit them from engaging in any employment incompatible with the faithful discharge of their official duties. And of what is thus incompatible the legislature is the judge, provided always that no constitutional right is denied or abridged. The consequences of any other doctrine might be serious, if not disastrous, to the best interests of the state. Take, for illustration, the case before us. Can it be said that the active participation in politics by the superintendent of public instruction and the various county superintendents of schools would not be in the highest degree injurious to the public free school system of the state—a system in which the people of all classes and opinions are so deeply interested? Or can it be denied that such participation in politics by the judges could result otherwise than in degrading the judiciary in the estimation of all right-minded men? And does not sound policy, and even humanity, forbid those in charge of the unfortunate insane of the state from quitting their important posts for the political arena? To ask, is to answer these questions. Yet the truth is, the offices of the country have come to be regarded by very many, not so much as public trusts to be

administered for the general welfare, as means for the attainment of political ends, and thus a system is established which tends to produce dependence and disorder rather than independence and efficiency in the civil service of the state and nation. In my judgment it is within the power of the legislature, in a measure at least, to correct the evil, by forbidding those in the service of the state from active participation in politics, and by imposing adequate penalties for a violation of the law.

But it is said that the act in question denies to the citizen his constitutional liberty of speech, and is, therefore, null and void. The provisions of the constitution relied on are these: "Any citizen may speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty." Art. I, § 14. And again: "The general assembly shall not pass any law * * * abridging the freedom of speech or of the press." Art. V, § 14. I am unable to see how the right here guaranteed is denied by the sections of the act I am considering. It seems to me it is not the exercise, but the abuse of the right which those sections forbid; for when the citizen voluntarily assumes the duties of an office, it becomes his duty, and he solemnly swears to discharge its duties faithfully and to the best of his ability, according to law. His right to speak and to write and to publish his sentiments on any subject is not denied, but it does not follow that he may, with impunity, neglect his official duties to devote his time and attention to politics.

In like manner, the freedom of the press is guaranteed by the constitution, but he who abuses the right and publishes a libel may be indicted and punished therefor, and that, too, ordinarily without regard to the truth of the publication; like, as has been said, the right to keep fire-arms, which does not protect him who uses them for annoyance or destruction.

But I do not desire to enter into any extended discussion of the case, for it seems to me that the principle upon which the legislation in question rests has been emphatically asserted in a recent decision of this court. In the case of *Gallalee* v. *Calvert*

*et als.,* decided at the last term at Richmond, it was held that although the legislature cannot, except under peculiar circum-. stances, prescribe qualifications for office in addition to those prescribed by the constitution, yet that it may by law exact the forfeiture of any state, county, city or town office, the incumbent of which accepts or continues in any office or employment under the government of the United States. And accordingly it was further held that the petitioner in that case, by his continuance in the employment of the United States as a laborer or mechanic in the Portsmouth navy yard, had waived and vacated the office of registrar to which he had been appointed. Now, here was a positive and distinct affirmation of the power of the legislature to prohibit those holding state offices from engaging in any employment which, in its judgment, is incompatible with the faithful discharge of their official duties. For on no other ground could the act reviewed in that case have been sustained. It certainly cannot be contended that the legislature may prohibit a citizen of Virginia from holding a federal office, but undoubtedly it may provide that no person shall hold a state and federal office at one and the same time. And this it may do, notwithstanding the right of the citizen to aspire to, and if he possesses the proper qualifications, to hold, if tendered, a federal office is a constitutional right as firmly secured as is the freedom of speech or any other right recognized by the constitution, state or federal. Nor is the freedom of speech a more sacred right than the absolute right of the citizen to acquire property and to use it for such purposes as he pleases, not in themselves unlawful. In these particulars the guaranties of the federal and state constitutions are substantially the same, and, therefore, it seems to me the present case is analogous in principle to the recent case of *ex parte Curtis,* 106 U. S. 371.

In that case the facts were these: By an act of congress, approved August 15th, 1876, all executive officers and employees of the United States, not appointed by the president

with the advice and consent of the senate, were prohibited from requesting, giving to, or receiving from any other officer or employee of the government any money or property, or other thing of value, for political purposes. And it was provided that any such officer or employee who should offend against the provisions of the act, should be discharged from the service, and moreover should be deemed guilty of a misdemeanor, and, on conviction, fined in a sum not exceeding five hundred dollars. Under this act Curtis, the petitioner. was indicted and convicted in the United States circuit court for the southern district of New York, and having been committed to the custody of the marshal until payment of the fine imposed should be made, he applied for a writ of *habeas corpus,* upon which the case was heard and determined by the supreme court of the United States, the only question being whether the act was constitutional. For the petitioner it was urged that to deny the citizen the privilege of associating with and making joint contributions to such of his fellow-citizens as he might choose, was a wrongful restraint of his constitutional right to propagate and promote his views on public affairs; that the right, like the freedom of speech and of the press, was secured by the constitution, and could not be restrained by congress. But the court held the act to be constitutional. As a regulation of the conduct of certain officers of the government, it was said to rest on the same principle as many previous statutes of a kindred character, the constitutionality of which had never been questioned. In delivering the opinion of the court, the chief justice said : "The evident purpose of congress in all this class of enactments has been to promote efficiency and integrity in the discharge of official duties, and to maintain proper discipline in the public service. Clearly such a purpose is within the just scope of legislative power, and it is not easy to see why the act now under consideration does not come fairly within the legitimate means to such an end."

Now if, with this object in view, the legislature may prohibit an officer from giving to another a single penny of his own

means, to be legitimately applied for political purposes, why may it not prohibit him from devoting his time and attention to the promotion of the same ends? I perceive no distinction in principle between that case and this. In the one case, the officer is protected against enforced contributions of his means, in the other against demands upon his time and services, for political purposes; the primary object in both cases being to secure the independence of certain officials, and consequently increased efficiency in the public service.

. I think the opinion of the majority denies to the legislature a power it clearly possesses, and for the foregoing reasons I feel constrained to dissent from its conclusions.

FAUNTLEROY and RICHARDSON, Js., concurred in the opinion of LACY, J.

HINTON, J., reserved his opinion.

JUDGMENT REVERSED.